## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER RUSANOWSKY,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 3:22-cv-1132** |
| **THE CITY OF DALLAS and SGT.** | § | |
| **ROGER A. RUDLOFF, individually** | § | |
| **and in his official capacity as a Dallas** | § | **JURY TRIAL DEMANDED** |
| **Police Department Police Officer,** | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFF'S COMPLAINT

Plaintiff Christopher A. Rusanowsky brings this action for damages and all other legal and equitable relief from the City of Dallas, Texas ("the City") and Sgt. Roger A. Rudloff, individually and in his official capacity as a Dallas Police Department ("DPD") Sergeant, for violating his rights under the U.S. Constitution, including his First Amendment right to photograph police activity free from retaliation, his Fourth Amendment protection against unlawful arrest, and any other cause(s) of action that can be reasonably inferred from the facts set forth herein.

## SUMMARY OF THE CASE

1.      On May 30, 2020, Plaintiff Christopher Rusanowsky was on assignment for ZUMA Press, Inc., photographing protesters in the City of Dallas after the death of George Floyd in Minneapolis. As a credentialed photojournalist, Rusanowsky documented a distinct moment in American history while clothed in the protections afforded by his fundamental rights to freedom of speech, freedom of the press, and freedom from unlawful arrest enshrined in the First and Fourth Amendments to the United States Constitution.

2.      Standing at a safe distance and in proximity to a small group of journalists covering that day's events, Rusanowsky was singled out by Defendant Sgt. Rudloff and the DPD not because he was in the fray (he was not) but because he photographed Sgt. Rudloff as the officer shot an unarmed protester, Jantzen Verastique, in the chest with a PepperBall round and kneed another, Parker Nevills, in the stomach while Nevills' hands were behind his back.

3.      Empowered by the City, Defendant Sgt. Rudloff arrested Verastique and Nevills before arresting Rusanowsky without probable cause, causing him to be jailed overnight, despite having knowledge that Rusanowsky was a credentialed photographer exercising his established First Amendment right to photograph police activity in public.

4.      Defendant Sgt. Rudloff arrested Rusanowsky and not similarly-situated journalists, with the only distinguishing feature between Rusanowksy and the other journalists being that Rusanowsky focused his lens on the Defendant officer's violent arrests of Verastique and Nevills.

5.      In conflicting accounts issued at different times in different official documents, the City accused Rusanowsky of violating separate sections of the Texas penal code—the crime of obstructing a highway and the crime of riot participation—to justify the wrongful arrest and overnight detention. But Rusanowsky's legal and constitutionally protected journalistic work violated neither code section. Rather, the City and DPD offered *post hoc* rationalizations for Sgt. Rudloff's arrest of Rusanowsky and their blatant violations of his First and Fourth Amendment rights through Defendant Sgt. Rudloff's unconstitutional actions.

## PARTIES

6.      Plaintiff Christopher Rusanowsky is a Texas resident. He currently resides at 1528 Tumbleweed Trail, Northlake, Texas 75226.

7.     Defendant the City of Dallas, Texas, is a political subdivision of the State of Texas and operates and controls the Dallas Police Department. Defendant is located in the State of Texas and within the Northern District of Texas, Dallas Division, and may be served with process through City Attorney Christopher J. Caso at the Dallas City Attorney's Office, 1500 Marilla St., 7 D North, Dallas, TX 75201, or City Secretary Billierae Johnson at the Dallas City Secretary's Office, 1500 Marilla Street, Room 5 D South, Dallas, TX 75201.

8.     Defendant Sgt. Roger A. Rudloff is a Texas resident and a police officer employed by DPD.

9.     Defendant Sgt. Rudloff can be served with process at DPD Headquarters, 1400 Botham Jean Boulevard, Dallas, Texas 75215, or wherever he may be found.

## JURISDICTION AND VENUE

10.     Rusanowsky re-alleges and incorporates by reference the allegations contained in the preceding paragraphs.

11.     Federal jurisdiction over this action is proper in this Court pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; 42 U.S.C. §§ 2000e *et seq.*, as amended, and (iii) 42 U.S.C. §§ 1983 *et seq.*, as amended.

12.     The Court has general personal jurisdiction over Defendants the City of Dallas and Sgt. Rudloff by virtue of their citizenship, residence in Dallas County, and continuous and systematic contacts with the State of Texas. Defendant City of Dallas is a municipality incorporated in

the State of Texas. Upon information and belief, Defendant Sgt. Rudloff is a resident of the State of Texas and an officer for the DPD.

13.     The Court also has specific personal jurisdiction over Defendants City of Dallas and Sgt. Rudloff because Rusanowsky's claims against them arise out of or relate to a contact between Defendants and the State of Texas. Defendant Sgt. Rudloff, acting on orders and policies promulgated by City of Dallas policymakers, wrongfully arrested Rusanowsky in violation of his First and Fourth Amendment rights immediately after being photographed using excessive force on protesters. Moreover, City of Dallas policymakers promulgated policies that kept Defendant Sgt. Rudloff in a role where he directly interfaced with members of the public, even after an unusually large number of incidents where Sgt. Rudloff was alleged to have used excessive force on citizens.  Rusanowsky's claims against these Defendants arise from those actions and Defendants' contacts in the State of Texas.

14.     Venue is proper in this district under 28 U.S.C. § 1391 because (a) Defendants reside or have a principal place of business in this district, and (b) all or a substantial part of the events giving rise to Rusanowsky's claims occurred in this district.

## FACTS

**A.     Christopher Rusanowsky's Background**

15.     Plaintiff Christopher Rusanowsky ("Rusanowsky") is a freelance photojournalist. He has worked in journalism for many years, and currently sells his photographs to media outlets through his employer ZUMA Press, Inc. ZUMA provided Rusanowsky with a press credential that he wears prominently while on assignment for the outlet.

16.     Rusanowsky is also a member of the National Press Photographers Association ("NPPA"), a trade group dedicated to the advancement of visual journalism in all news media. He also wears his NPPA credential while on assignments.

**B.     The Unconstitutional Arrest**

17.     On May 30, 2020, Rusanowsky was assigned to work in Dallas, Texas, covering a protest organized in response to the death of George Floyd in Minneapolis.

18.     Following Mr. Floyd's murder at the hands of a Minneapolis police officer on May 25, protests occured across the nation.[1] As early as May 27, protests were organized in cities including Memphis, Los Angeles, St. Louis, and Chicago.[2] On May 29, demonstrations in Atlanta, New York City, Washington, D.C., and Detroit led to injuries and mass arrests.[3] By the time Rusanowsky drove to his assignment in downtown Dallas on May 30, the nation's other metropolitan police forces, including DPD, had been notified through nationwide news coverage of the widespread protests that this socio-cultural flashpoint would likely lead to large protests in their own cities.

19.     Upon arriving in downtown Dallas, Rusanowsky parked his car and began to photograph protesters in the area. Rusanowsky made a point of finding a group of journalists also on the scene. He worked in close vicinity to three other journalists, including a student journalist and journalists from the Dallas Morning News and the Fort Worth Star-Telegram, up until the time of his arrest.

20.     When protesters marched onto Interstate 35, the journalists documented it. These journalists made their way to a grassy shoulder adjacent to a highway off-ramp where they could

---

[1] Derrick Bryson Taylor, *George Floyd Protests: A Timeline*, N.Y. TIMES (Nov. 5, 2021) https://www.ny-times.com/article/george-floyd-protests-timeline.html.
[2] *Id.*
[3] *Id*.

5

photograph the protesters who marched onto the highway and the officers who pursued them. Of-

ficers confronted a small group of protesters who had also moved to the grassy shoulder. The

journalists—Rusanowsky included—photographed the confrontation without obstructing the of-

ficers.

21.     It was from this vantage point that Rusanowsky witnessed officers begin to make a

series of arrests. One officer in particular, who Rusanowsky later learned was Defendant Sgt. Rud-

loff, approached a female protester, Jantzen Verastique. Verastique was apparently protesting the

arrests and treatment of fellow protesters. At 8:33 p.m., Defendant Sgt. Rudloff, armed with a

PepperBall gun, confronted Verastique and shot her with a pepper ball in the chest from close

range. Rusanowsky captured the moment as Verastique recoiled from the impact of the pepper

ball. This photograph was subsequently licensed and sold by his employer, ZUMA.



22.    Verastique was detained shortly after being shot. Rusanowsky did not impede or obstruct any members of the DPD from making this or any other arrests.

23.    Immediately after Defendant Sgt. Rudloff shot Verastique, another unarmed protester, Parker Nevills, approached the group of officers. Nevills was also aggressively detained by Defendant Sgt. Rudloff, who grabbed Nevills by the hair and allegedly kneed him in the stomach.[4] Rusanowsky photographed Defendant Sgt. Rudloff's use of force against Nevills. This photograph was also licensed and sold by Rusanowsky's employer, ZUMA, and shows Defendant Sgt. Rudloff seizing the unarmed Nevills by the hair.



---

[4] Miles Moffeit, Cassandra Jaramillo & Madi Alexander, *Flashlight beatings, chokings and threats: Dallas officer faced multiple accusations of brutality*, THE DALLAS MORNING NEWS (Sep. 16, 2021) https://www.dal-lasnews.com/news/investigations/2021/09/16/flashlight-beatings-chokings-and-threats-dallas-officer-faced-multiple-allegations-brutality/

24.     Recognizing that his use of force against two unarmed protesters had been captured by Rusanowsky, Defendant Sgt. Rudloff (who has acknowledged that he was not wearing a body camera on May 30)[5] turned in the direction of Rusanowsky and shouted "you're next!"

25.     Rusanowsky was carrying laminated press credentials from ZUMA and the NPPA, a ZUMA Press baseball cap, and professional photography gear.

26.     Giving Defendant Sgt. Rudloff the opportunity to retract his threatened arrest, Rusanowsky verbally objected and physically displayed that he was a journalist, though it was obvious from his professional cameras and laminated ID badges he wore. "I'm press, I'm press," Rusanowsky said as Defendant Sgt. Rudloff walked down a slight hill towards him. As Defendant Sgt. Rudloff got closer, Chris displayed his ZUMA Press, Inc. press credential but Defendant Sgt. Rudloff had already made his mind up.

---

[5] Miles Moffeit, Cassandra Jaramillo, & Dianne Solis, *'I felt like my chest was on fire': Photo shows Dallas police officer shooting protester with pepper-ball gun*, THE DALLAS MORNING NEWS (Aug. 9, 2020) https://www.dallasnews.com/news/investigations/2020/08/09/i-felt-like-my-chest-was-on-fire-photo-shows-cop-blasting-a-peaceful-protester-with-a-pepper-ball-gun-at-close-range/



27. Defendant Sgt. Rudloff responded mockingly, "Yeah, yeah, press, press," and then, "You're going to jail."

28. This statement proved true. Upon the order of Defendant Sgt. Rudloff, who was the supervising officer at the scene, another officer quickly forced Rusanowsky onto his stomach and cuffed his hands behind his back. While cuffed and detained, Rusanowsky was warned that his cameras, containing the photographic evidence of Defendant Sgt. Rudloff's use of force against Verastique and Nevills, would be destroyed if the officers felt that they were a threat.

29. Rusanowsky's arrest was due to a lack of adequate training regarding the policing of protests, a failure on the part of the City to supervise and discipline officers who would interfere with this right, and deliberate indifference by the City Council to a culture of disregard for this right.

30.     Rusanowsky was then moved with several other arrestees to a holding area under a highway overpass and later forced into a crowded van. He was held there for several hours without any explanation from DPD officers as to why he had been arrested.

31.     Neither Defendant Sgt. Rudloff nor the officer that handcuffed Rusanowsky at his direction provided charges, verbal or written, upon arrest. Rusanowsky repeatedly asked officers what he was being charged with and received no response. In fact, while Rusanowsky was being held under the overpass, an officer detaining him did not know his charges and asked Rusanowsky to provide this information, which he was unable to do.

32.     Finally, after being transported to the jail and processed, Rusanowsky was informed at his arraignment that he was being charged with obstruction of a highway in violation of the law. This was surprising as Rusanowsky first saw Defendant Sgt. Rudloff and the other arresting officers when he was on the grassy shoulder, well away from the highway.

33.     Multiple photographs of the arrest taken by a Dallas Morning News photographer and a local student photojournalist all show that Rusanowsky was well clear of any roadway at the time of his arrest, indicating there was no probable cause to justify Rusanowsky's arrest for highway obstruction under Texas law. In fact, as he photographed the arrest of Verastique, Rusanowsky was clearly located farther from a roadway than Defendant Sgt. Rudloff himself.







34.     As a supervising officer on the scene at the grassy shoulder, Defendant Sgt. Rudloff was responsible for ensuring that all bystanders, including members of the press like Rusanowsky, were protected in the exercise of their established constitutional right to observe and photograph police activity.[6]  But Rusanowsky received no such protection from Defendant Sgt. Rudloff.

35.     At no point in time prior to his arrest did Defendant Sgt. Rudloff or any other officer on the grassy shoulder indicate to Rusanowsky that his photography was impeding their work.[7] Nor did Defendant or any other officer request that Rusanowsky continue his photography from a different location.[8]  Instead, as Rusanowsky was in the midst of exercising his constitutional right as a member of the press and public to document police activity by taking photographs, he was

---

[6] Public Recording of Official Acts: Policy, *General Order 331.01*, Dallas Police Department (revised Apr. 4, 2020).
[7] Public Recording of Official Acts: Supervisor Responsibilities, *General Order 331.06(B)(2)*, Dallas Police Department (revised Apr. 4, 2020).
[8] *Id.* at 331.06(B)(3).

singled out by Defendant Sgt. Rudloff and unlawfully arrested without probable cause after witnessing Defendant Sgt. Rudloff's use of force against Verastique and Nevills.

36.     In compliance with DPD's Press Relations policy, Rusanowsky displayed the appropriate press credentials at all times.  At no time did Rusanowsky resist, obstruct, or oppose DPD officers in the execution of their duties.[9]

37.     Defendant Sgt. Rudloff and the DPD initially charged Rusanowsky with obstructing a highway, according to Rusanowsky's Notice of Court Setting and Arraignment Sheet.[10] A DPD Incident Report describing Rusanowsky's arrest, however, makes no mention of his obstructing a highway or of Section 42.03. The report instead lists Rusanowsky's offense as "RIOT PARTICIPATION" . . . "42.02A."

38.     Rusanowsky's photojournalism activities on May 30 also clearly do not meet any of the essential elements of the Texas riot statute, which defines a riot as an assemblage of seven or more person where the resulting conduct of the group "creates an immediate danger of damage to property or injury to persons; substantially obstructs law enforcement or other government functions or services; or by force, threat of force, or physical action deprives any person of a legal right or disturbs any person in the enjoyment of a legal right."[11]

39.     At all relevant times, Rusanowsky was clearly separated from the protesters who were also arrested that day.

40.     At all relevant times, Rusanowsky was photographing the protesters with professional cameras and carrying two forms of press identification on a lanyard around his neck.

---

[9] News Media Requirements and Privileges, *General Order 323.01 (A)-(B)*, Dallas Police Department (revised Jan. 30, 2007).
[10] TEX. PEN. CODE ANN. § 42.03.
[11] TEX. PEN. CODE ANN. § 42.02(a).

41.     To Rusanowsky's knowledge, he was the only person arrested on the grassy shoulder who carried journalist's equipment and who clearly declared himself to be a member of the press—a declaration that was heard by DPD officers and acknowledged by Defendant Sgt. Rudloff.[12]

42.     Despite their awareness that Rusanowsky was a journalist, Defendant Sgt. Rudloff and other officers on the scene did not attempt to give Rusanowsky instructions to move further away from where they were making arrests, or identify an area where he could continue his reporting, in accordance with DPD procedures for police supervisors interacting with people who publicly record official acts but who, in the view of police, are "interrupting, disrupting, impeding, or interfering" with officers' execution of official duties.[13] Additionally, none of the officers indicated at any time that Rusanowsky's photography was impeding their work, nor did they give him any other form of warning prior to his arrest. Finally, none of the officers attempted to verify whether Rusanowsky was a member of the press—likely because they did not question this fact. At all relevant times, Rusanowsky was in compliance with DPD's Press Relations policy by displaying his press credentials and causing no obstruction or disruption to DPD officers.[14]

43.     The action as it unfolded tells a very different story than the accusations levied by Defendants: Defendant Sgt. Rudloff arrested Rusanowsky in retaliation for having photographed Sgt. Rudloff's use of force on two defenseless protesters.

44.     At all relevant times before the arrest, Rusanowsky was working in the vicinity of a group of journalists, including other photographers.[15] What differentiated Rusanowsky from

---

[12] Committee to Protect Journalists, *Photojournalist arrested covering Dallas protests, camera equipment seized*, U.S. Press Freedom Tracker (May 30, 2020) https://pressfreedomtracker.us/all-incidents/photojournalist-arrested-covering-dallas-protests-camera-equipment-seized/
[13] *General Order 331.06*, *supra* note 6.
[14] *General Order 323.01*, *supra* note 8.
[15] Comm. to Protect Journalists, *supra* note 12.

these other journalists was not any obstruction of police activity, not any obstruction of traffic or of a highway, and not participation in a riot or the protest he was assigned to cover. Rather, what was different is that Rusanowsky was identified by Defendant Sgt. Rudloff capturing the sergeant's own excessive use of force against two unarmed protesters, activity clearly protected by the First Amendment.

45.     The other journalists, including a Dallas Morning News photographer, did not capture that moment, as evidenced by the fact that the Dallas Morning News licensed Rusanowsky's photograph and placed it on the front page of the Sunday, Aug. 9, 2020, newspaper above the headline "A blast at close range: Photo shows cop firing pepper-ball gun at a peaceful protester."[16]

46.     The City's unconstitutional failure to train officers on interactions with media personnel, interactions with protesters, rules of engagement, and mass arrest procedures in advance of this nationally significant weekend of widespread protests empowered Defendant Sgt. Rudloff to order Rusanowsky's arrest.

47.     At the holding area, Rusanowsky was put in a crowded truck used to transfer detainees to a staging area for further questioning. Rusanowsky was moved into a larger but also cramped holding vehicle with at least 12 other people where he was held for several hours. DPD used no precautions to protect detainees from transmission of COVID-19, recklessly endangering those being held. It showed clear disregard for the dangerous pandemic.

48.     Rusanowsky was ultimately brought to the Lew Sterrett Justice Center where he was jailed overnight in unsanitary and dangerous conditions for approximately 26 hours.

49.     Months after his arrest, Rusanowsky learned that authorities were dropping the charges against him, along with charges against numerous protesters. Rusanowsky learned of the

---

[16] Moffeit et al., *supra* note 5.

dropped charges from a fellow journalist; no official with the City, Dallas County, or DPD ever contacted Rusanowsky to let him know his charges had been dropped.[17]

50.     In response to complaints filed against Defendant Sgt. Rudloff by Verastique and others, Rusanowsky was interviewed by the DPD's Public Integrity division on October 20, 2020, and November 23, 2020. During his interviews, Rusanowsky emphasized that Defendant Sgt. Rudloff was the officer that "started to make things happen," that it seemed like Defendant was "the one that was in charge" of the arresting officers, and that "all hell broke loose" when Defendant and his fellow officers arrived at the grassy shoulder.[18]

### C. Aftermath and Investigation: Defendant Sgt. Rudloff's History of Complaints and the City's Failure to Supervise and Discipline Officers

51.     Numerous news outlets covered the protests, including Defendant Sgt. Rudloff's conduct on the day of Rusanowsky's arrest. A Dallas Morning News ("DMN") article described the arrests of Verastique and Nevills, both of which were photographed by Rusanowsky shortly before his arrest.[19]  Members of the public and some City Council members raised serious questions about how the City handled the protests. In the middle of this firestorm, DPD Chief Renee Hall announced that she would retire from her post in November 2020.

52.     The incident drew more media attention at various points over the next year and a half when a grand jury considered charges against Defendant Sgt. Rudloff's conduct, when DPD released bodycam footage to the DMN showing Sgt. Rudloff kneeing Nevills in the stomach while

---

[17] *Id.*
[18] *Transcript of videotaped interview between Chris Rusanowsky and Detective McCloud*, DPD Public Integrity Unit (Oct. 20, 2020) (attached).
[19] Moffeit et al., *supra* note 5.

Nevills' hands were behind his back, and when Verastique and Nevills filed complaints alleging Defendant Sgt. Rudloff used excessive force.[20]

53.     But Verastique and Nevills are hardly the only members of the public to complain about Defendant Sgt. Rudloff using excessive force against them. He has been the subject of nineteen department investigations in more than two decades of service, five of which ended in disciplinary action.[21]

54.     In September 2021, the DMN published an article based on numerous police and court documents describing the incidents that triggered these investigations:[22]

55.     In July 1998, Defendant Sgt. Rudloff allegedly threatened to beat a Black man with a flashlight. According to the sworn statement the man gave to DPD Internal Affairs, Defendant Sgt. Rudloff told him that he used the flashlight to "beat n-----s in the head."[23]

56.     In October 1998, another complaint alleged that Defendant Sgt. Rudloff choked a driver after stopping her for failure to use a turn signal.[24]

57.     Between 1998 and 2000, another eight complaints were filed against Defendant Sgt. Rudloff for alleged physical and verbal abuse.[25]

58.     In January 1999, after responding to a disturbance call involving a man with a gun, Defendant Sgt. Rudloff handcuffed an unarmed Black man, allegedly striking him with the palm of his hand and choking him.[26]

---

[20] Miles Moffeit & Cassandra Jaramillo, *Grand jury to weigh criminal charges against Dallas officer who fired pepper balls at protester*, THE DALLAS MORNING NEWS (Nov. 12, 2021) https://www.dallasnews.com/news/investigations/2021/11/12/grand-jury-to-weigh-criminal-charges-against-dallas-officer-who-fired-pepper-balls-at-protester/.

[21] Moffeit et al. *supra* note 4.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*

59.    Two separate complaints and accompanying federal lawsuits were filed against Defendant Sgt. Rudloff in 1999, alleging two separate instances in which Defendant assaulted Black men with his flashlight.[27]

60.    In November 1999, Defendant Sgt. Rudloff beat Keith Burkins so severely with a flashlight that Burkins required seven staples in his head. A senior corporal who witnessed the assault reported Defendant Sgt. Rudloff to a supervisor, but Defendant Sgt. Rudloff denied any wrongdoing and claimed Burkins hit his head on a sidewalk. DPD investigated the allegations for nine months, during which time Defendant Sgt. Rudloff was allowed to stay on patrol, and although investigators concluded that Defendant was "untruthful" both in an account given to his supervisor and in his written statement, the sum total of DPD's disciplinary action against Defendant was to place him on a ten-day unpaid suspension.[28]

61.    In 2002, Defendant Sgt. Rudloff was accused of racial profiling when he frisked a Black man waiting at a bus stop, allegedly telling the man that he was being searched because Defendant was looking for a Black suspect and he was Black.[29]

62.    In 2005, Defendant Sgt. Rudloff were sued in their individual capacities for assault and battery of and use of excessive force against Bret Poat.[30] Poat, the plaintiff, alleged that two officers who transported him from the scene of his arrest (one of whom the City identified as Defendant Sgt. Rudloff) assaulted him by repeatedly striking his face and battering him with a nightstick.[31] Two weeks before the case was scheduled for trial on the assault and battery and excessive force claims, it was settled.[32]

---

[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] Orig. Cpt., ECF 1, *Poat v. Scroggins* (Dec. 28, 2005, N.D. Tex.) (No. 3:05-cv-2516).
[31] *Id.*; Answer to Cpt. by Kenneth Francis, Roger Andrew Rudloff, ECF 6, *Poat v. Scroggins* (Feb. 28, 2006) (No. 3:05-cv-2516)
[32] Order, ECF 56, *Poat v. Scroggins* (Nov. 1, 2007)

63.     In 2009, after his promotion to sergeant, Defendant was yet again accused of excessive force when he and other officers allegedly slammed a man's head into the ground while arresting him for public intoxication.[33]

64.     In 2012, Defendant Sgt. Rudloff and two other officers fatally shot a carjacking suspect, firing about thirty rounds into his car. Defendant Sgt. Rudloff was "admonished" by a supervisor after the shooting for violating DPD policy by using a firearm for which he was unqualified.[34]

65.     And in 2018, Defendant Sgt. Rudloff was "rebuked" for "making a lewd comment about a dead woman in a conversation over a police radio with other officers."[35]

66.     Despite the numerous and near-continuous allegations lodged against Defendant Sgt. Rudloff since the 1999 incident, the DPD's ten-day suspension for the incident involving Burkins, according to the article, is the most significant disciplinary consequence the DPD has imposed on Defendant.[36]

67.     Rather than discipline or terminate Defendant Sgt. Rudloff, the City through the DPD has showered him with praise. Defendant was promoted to senior corporal in 2003, then to sergeant in 2007.[37]

68.     Consistent with this pattern of implicit permission, DPD again backed Defendant Sgt. Rudloff in the face of investigations stemming from protester complaints about Sgt. Rudloff's actions during the George Floyd protests.

---

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*

69.     According to the DMN, DPD closed a criminal investigation into Defendant Sgt. Rudloff's shooting of Verastique without a public statement or any notice given to the Office of Community Police Oversight.[38]  As of the filing of this Original Complaint, it is unclear whether any internal affairs investigation regarding Defendant Sgt. Rudloff's conduct is ongoing, and DPD has only spoken about Defendant Sgt. Rudloff's conduct during the 2020 protests in response to questions from the news media.

70.     The City's Charter gives the City the power to "make and enforce all police . . . regulations, and pass such ordinances as may be expedient for maintaining and promoting the peace, good government, and welfare of the city, for the performance of the functions thereof." City Charter, Ch. II, § 1(31). It also gives the chief of police "the right to discipline any of the officers or employees who may be under the chief's jurisdiction and control for violations of city ordinances or federal or state law, or for failure to obey orders given by the proper authority, or the orders, rules, and regulations promulgated by the chief of police."[39] The City thus delegates decisions to discipline or not discipline DPD officers to the Chief of Police who, time after time, chose not to meaningfully discipline Defendant Sgt. Rudloff after allegations upon allegations of constitutional violations. The City Council through this delegation acted as a policy maker over the more than two decades Defendant Sgt. Rudloff was kept on the force. Following this policy, several different police chiefs did not properly address these serious incidents through DPD's disciplinary system.

---

[38] Cassandra Jaramillo, Miles Moffeit & Madi Alexander, *Watchdog calls for more transparency from Dallas police on investigations into officer misconduct*, . THE DALLAS MORNING NEWS (Sept. 21, 2021), https://www.dallasnews.com/news/investigations/2021/09/21/watchdog-calls-for-more-transparency-from-dallas-police-on-investigations-into-officer-misconduct/
[39] *City of Dallas Charter*, Ch. XII, § 4.

71.     The City Council, through its appointment of a City Manager who in turn appoints a Chief of Police, is the policy maker with regard to police discipline.[40] This authority is further laid out in a recent audit of the DPD complaint process, which describes its ability to influence the disciplinary process through the creation of an Office of Community Police Oversight to monitor Internal Affairs Division investigations at DPD.[41] However, in creating the office, the City Council failed to give that body serious authority or input into the disciplinary process, as evidenced by the fact that they were not kept updated about the DPD's recent investigation into Defendant Sgt. Rudloff, or even informed when the criminal case against him had been dismissed.[42]

72.     The City also failed to properly supervise Defendant Sgt. Rudloff. Its supervision policies were clearly inadequate as evidenced by the nearly 20 incidents described in this complaint. The need for more or different supervision would have been obvious to city policymakers and the failure of the supervision system was bound to result in more constitutional violations putting citizens at risk.

73.     The closure of DPD's criminal investigation into Defendant Sgt. Rudloff and DPD's continued failure to disclose relevant information to the Office of Community Police Oversight regarding investigations into Defendant Sgt. Rudloff's conduct together suggest that the City will continue to avoid holding Defendant Sgt. Rudloff accountable for his unconstitutional actions.

---

[40] *Id.* at Ch. VI, § 1; Ch. 37, § 20.
[41] Audit of the Dallas Police Department's Complaint Process, Mark S. Swann, City Auditor, Nov. 25, 2019, Appx. A, https://dallascityhall.com/departments/auditor/DCH%20Documents/Audit%20of%20the%20Dallas%20Police%20Department%27s%20Complaint%20Process%2011-25-2019.pdf
[42] Jaramillo et al., *supra* note 38.

74.     DPD continues to sweep the wrongdoing of Defendant Sgt. Rudloff under the proverbial rug, denying justice to his victims, and refuses to take accountability for its own failures in training and communication that led to the disastrous events of the protest weekend, including Rusanowsky's arrest.

**C.     The City Failed to Train its Officers Before the Floyd Protests**

75.     Press coverage, DPD limited statements issued in response to such coverage, and DPD reporting to the City Council collectively show how DPD failed to adequately train officers, including Defendant Sgt. Rudloff, in a number of crucial areas before the protests and before Rusanowsky's arrest.

76.     In August 2020, DPD issued a final After-Action Report (the AAR) to assess the Department's overall performance during the protests and analyze the multiple ways that poor communication and lack of training created the perfect storm of chaos in its officers' actions during the weekend of the protests.[43]

77.     The AAR is defined as a "critical self-analysis intended to inspire concrete steps for organizational growth and development" that assesses "errors, miscalculations, and shortcomings" in accordance with the National Police Foundation standard for after action reporting.[44]

78.     The AAR highlights several areas in which the DPD's actions during the protest weekend were deficient, and draws attention to several major gaps in DPD policy and training that existed at the time of Rusanowsky's arrest.[45]

---

[43] *George Floyd Protest After Action Report*, DALLAS POLICE DEP'T, at 1 (Aug. 14, 2020).
[44] *Id.*
[45] *Id.*

79.     DPD failed to include the rules of engagement in its Operational Plans for May 29 and May 30 (the day Rusanowsky was arrested), indicating that DPD failed to provide its officers with any guidance on the rules of engagement before arming those officers, including Defendant Sgt. Rudloff, with multiple forms of less lethal munitions and sending them out to police the protests.[46]

80.     The AAR also concedes that officers and supervisors clearly had not received sufficient prior training, acknowledging that "it was clear to Field Commanders that regular and re-occurring training on Mobile Field Force Tactics is needed" as "officers and supervisors . . . appeared unsure as to the best tactics during officer/protester encounters."[47]

81.     The AAR further details DPD's revisions to its use-of-force policies after the criticism it received in the wake of the protests, implementing General Order 902.02 (restricting the use of PepperBall launchers into a crowd), General Order 908.04 (restricting the use of the 40 m.m. "Stinger" into a crowd), and General Order 901.02 (establishing an officer's duty to intervene on the behalf of an individual subjected to unlawful or unnecessary force).[48]

82.     After significant public outrage following the visible, repeated deployment of CS gas against protesters on the Margaret Hunt Hill Bridge, DPD also revised its policy on CS gas use, stating that in future, CS gas would not be used to direct crowd movements and would only be deployed at the direction of the Police Chief or her designee.[49]

83.     The AAR also emphasizes the future need for the creation of a mass-arrest strategy "prior to an event occurring," which speaks to the fact that there was no such mass-arrest strategy in place on the day of Rusanowsky's arrest and that DPD failed to train its officers in the

---

[46] *Id*. at 22.
[47] *Id*. at 41.
[48] *Id*. at 45.
[49] *Id*. at 5, 15.

proper procedure for mass arrests, leading to the widespread chaos and confusion in which Rusanowsky was arrested.[50]

84.     These after-the-fact changes strongly indicate that at the time of Rusanowsky's arrest, DPD failed to train its officers, including Defendant Sgt. Rudloff, with regard to mass arrests, officer engagement with protesters, and the use of less lethal munitions.

85.     By the day of Rusanowsky's arrest, marches and demonstrations had been occurring throughout the nation for at least three consecutive days.[51] In failing to train its officers to manage protests similar to those which had already begun in Atlanta, Chicago, Los Angeles, Washington, D.C., New York, Detroit, and St. Louis, the City and DPD demonstrated careless indifference for the constitutional rights of protesters and members of the press, like Rusanowsky, who sought to exercise those rights during protests in Dallas.

## CAUSES OF ACTION

### COUNT I

**Violation of Rusanowsky's First and Fourteenth Amendment Rights, Pursuant to § 1983**

**(Against Defendant Rudloff)**

86.     Rusanowsky incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

87.     Observing and photographing police activity in public places is a legitimate means of gathering information for public dissemination that is protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the

---

[50] *Id*. at 26.
[51] *George Floyd Protests: A Timeline*, *supra* note 1.

State of Texas and instrumentalities of the state such as the City of Dallas under the Fourteenth Amendment.

88.     On May 30, 2020, Defendant Sgt. Rudloff, as a supervising officer, ordered the arrest of Rusanowsky for taking photographs of newsworthy events in a public place. By ordering that Rusanowsky be arrested and detained (a detention which continued for 26 hours) despite the fact that Rusanowsky wore two large professional cameras on his person, had press ID badges displayed prominently, and verbally identified himself as a member of the press, Sgt. Rudloff violated Rusanowsky's First Amendment right to photograph police activity.

89.     Rusanowsky informed Sgt. Rudloff that he was a member of the press, as his clothing indicated and as his credentials would have validated. Rather than attempt to verify Rusanowsky's profession or provide Rusanowsky with an alternate location from which he could continue exercising his First Amendment right to photograph police activity, Defendant Sgt. Rudloff had Rusanowsky arrested, ensuring that he would not be able to take any additional photographs of the protest or Defendant's interactions with protesters.

90.     Even if probable cause did exist for Rusanowsky's arrest, it does not shield Defendant Sgt. Rudloff from liability when "otherwise similarly situated individuals not engaged in the same sort of protected speech had not been [arrested]."[52]  Defendant Sgt. Rudloff did not order the arrest of any other journalist present at the scene that day, because no other journalist but Rusanowsky had captured photographs of Defendant Sgt. Rudloff's uses of force against protesters.

---

[52] *Nieves v. Bartlett*, 139 S. Ct. 1715, 1723 (2019).

91.     Defendant Sgt. Rudloff intentionally suppressed Rusanowsky's rights under the First Amendment by arresting him in retaliation for photographing Defendant Sgt. Rudloff's uses of force against Verastique and Nevills.

92.     Defendant Sgt. Rudloff's conduct violated Rusanowsky's clearly established First Amendment rights, of which Defendant knew, or of which a reasonable police officer should have known, making him liable under 42 U.S.C. § 1983. The Fifth Circuit has held that, as of February 2017, "First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions."[53]  Defendant Sgt. Rudloff ordered Rusanowsky's arrest in retaliation for Rusanowsky's exercise of this clearly established right.

93.     As a direct and proximate result of Defendant Sgt. Rudloff's actions, Rusanowsky suffered damages, including mental anguish, professional injuries, and damage to his reputation. Rusanowsky continues to experience anxiety and stress related to his encounter with Defendant Sgt. Rudloff, which has caused a chilling effect on Rusanowsky's constitutionally-protected press activities. Rusanowsky has not covered any events in Dallas with any police presence since his arrest.

94.     Defendant Sgt. Rudloff acted with evil motive or intent and/or reckless and callous indifference to Rusanowsky's First Amendment rights, entitling Rusanowsky to punitive damages.

95.     At all times, Defendant Sgt. Rudloff was acting within the scope of his employment with the City of Dallas and under color of state law.

---

[53] *Turner v. Lt. Driver*, 848 F.3d 678, 688 (5th Cir. 2017).

## COUNT II

**Violation of Rusanowsky's Fourth and Fourteenth Amendment Rights, Pursuant to § 1983
(Against Defendant Sgt. Rudloff)**

96.     Rusanowsky incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

97.     Under the Fourth Amendment to the United States Constitution, as applied to the State of Texas and instrumentalities of the state under the Fourteenth Amendment, Rusanowsky has a right to be free from unreasonable searches and seizures, including unlawful detention, seizure, and arrest that is not supported by a warrant, probable cause, or reasonable suspicion that Rusanowsky had engaged in, was engaging, or was about to engage in any criminal conduct.

98.     On May 30, 2020, Sgt. Rudloff ordered Rusanowsky to be arrested without a warrant and without probable cause. Sgt. Rudloff did not establish probable cause to effect the arrest of Rusanowsky for either obstruction of a highway or riot participation.

99.     While photographing the scene from the grassy shoulder, Rusanowsky was exercising his First Amendment rights as a journalist, and he differentiated himself from the other reporters in the area only by virtue of being positioned at an angle to capture Defendant Sgt. Rudloff's shooting of a female protester and other controversial actions.

100.     At all relevant times, Rusanowsky did not commit a crime and Defendant Sgt. Rudloff did not have probable cause or reasonable suspicion to believe Rusanowsky had engaged in, was engaging in, or was about to engage in any criminal conduct.

101.     Defendant Sgt. Rudloff's conduct violated Rusanowsky's clearly established Fourth Amendment rights, of which Sgt. Rudloff knew, or of which a reasonable police officer should have known, making him liable under 42 U.S.C. § 1983.

102.    As a direct and proximate result of Defendant Sgt. Rudloff's actions, Rusanowsky suffered damages, including mental anguish, professional injuries, and damage to his reputation. Rusanowsky continues to experience anxiety and fear of police, knowing that at any point, without probable cause, his freedom could be snatched away at the whim of a bad actor like Defendant Sgt. Rudloff.

103.    Defendant Sgt. Rudloff acted with evil motive or intent and/or reckless and callous indifference to Rusanowsky's Fourth Amendment rights, entitling Rusanowsky to punitive damages.

## COUNT III

**Violation of Rusanowsky's Fourth and Fourteenth Amendment Rights, Pursuant to § 1983
(Against Defendant Sgt. Rudloff)**

104.    Rusanowsky incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

105.    When Defendant Sgt. Rudloff ordered Rusanowsky to be arrested without probable cause, he initiated a malicious prosecution against Rusanowsky, giving rise to a violation of Rusanowsky's Fourth Amendment right to freedom from unreasonable seizure.

106.    As a direct result of Defendant Sgt. Rudloff's ordering of Rusanowsky's arrest, Rusanowsky was charged with riot participation and spent 26 hours in jail.

107.    There was no probable cause for Rusanowsky's arrest, nor for charges of riot participation that were brought against Rusanowsky. At no time did Rusanowsky create a danger to property or injury to persons, nor did he obstruct or impede law enforcement officers from performing their duties or deprive any persons of their legal rights or enjoyment thereof. He clearly identified himself as a journalist engaged in protect speech, stayed clear of the officers and

protesters, and did not engage with DPD officers in any way other than through his constitutionally protected photography from a non-intrusive vantage point of their public arrest activities.

108.    The prosecution of Rusanowsky was terminated in his favor when his charges were quietly dropped.

109.    Defendant Sgt. Rudloff acted with malice in effecting Rusanowsky's unconstitutional seizure and detention without probable cause. For purposes of a malicious prosecution claim, malice is defined as ill will or evil motive, or such gross indifference and reckless disregard for the rights of others as to amount to a knowing, unreasonable, wanton, and willful act. *Luce v. Interstate Adjusters, Inc.*, 26 S.W.3d 561 (Tex. App.—Dallas 2000). By ordering Rusanowsky's arrest without probable cause as Rusanowsky exercised his constitutionally protected right to photograph public police activity, with the intent to chill and prevent Rusanowsky's further exercise of that constitutional right, Defendant Sgt. Rudloff displayed gross indifference and reckless disregard for Rusanowsky's constitutional freedoms sufficient to constitute malicious intent.

110.    As a direct and proximate result of the malicious prosecution initiated by Defendant Sgt. Rudloff, Rusanowsky suffered damages, including mental anguish, professional injuries, and damage to his reputation. Rusanowsky experienced fear for his personal health and safety while confined in close proximity to other arrestees at the height of the COVID-19 pandemic, and continues to experience anxiety and stress related to his detention.

## COUNT IV

**Violation of Rusanowsky's First, Fourth, and Fourteenth Amendment Rights, Pursuant to § 1983 and Monell v. Dept. of Soc. Servs. of the City of New York, 436 U.S. 658 (1978) (Against Defendant City of Dallas)**

111.    Rusanowsky incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

29

112.    In arresting and jailing Rusanowsky without probable cause for taking photographs of police activity in a public place on May 30, 2020, Defendant Sgt. Rudloff violated Rusanowsky's clearly established First, Fourth, and Fourteenth Amendment rights.

113.    At all times relevant to this Complaint, Defendant Sgt. Rudloff was acting under color of state law. Due to DPD's failure to supervise and discipline an officer repeatedly drawing complaints for constitutional violations against citizens and its failure to train its officers in mass arrest procedures and interaction with protesters, Defendant Sgt. Rudloff was on the force and interfacing with citizens exercising their constitutional rights and was given free rein by the City's policymakers to engage with these protesters however he saw fit.

114.    The City failed to meaningfully supervise and discipline an officer repeatedly accused of constitutional violations and sued by multiple citizens in civil rights actions. These failures each constitute deliberate indifference on the part of City policymakers with regard to Rusanowsky's unconstitutional arrest after documenting Defendant Sgt. Rudloff's use of force against peaceful protesters.

115.    The City also failed to train its officers in protester engagement and mass arrest procedures, creating a situation in which officers were empowered to violate the civil rights of protesters, including Rusanowsky. This failure to train constitutes a deliberate indifference on the part of the City policymakers to the constitutional rights of any protesters, including Rusanowsky, with whom DPD officers came into contact during the Floyd protests.[54]

116.    Because the City's and the Dallas Police Department's deficient policies and practices were the moving force behind Defendant Sgt. Rudloff's violation of Rusanowsky's constitutional rights, the City is liable under 42 U.S.C. § 1983.

---

[54] *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

117.    As a direct and proximate result of the City's and DPD's unconstitutional policies and practices, Rusanowsky suffered damages, including mental anguish, professional injuries, and damage to his reputation.

## **JURY DEMAND**

118.    Plaintiff demands a jury trial of all claims in the Complaint on which a jury trial is available.

## PRAYER

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief:

    A.    A monetary judgment awarding Plaintiff actual damages for his mental anguish, professional injuries, and damage to his reputation;

    B.    An award of punitive damages against Defendant Sgt. Rudloff;

    C.    An award of costs and attorney's fees;

    D.    Pre- and post-judgment interest; and

    E.    Such other and further relief to which Plaintiff is justly entitled.

Respectfully submitted,

By: */S/ Michael W. Shapiro*
Michael W. Shapiro
Texas Bar No. 24120472
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, Texas 75275
Tel.: (214) 768-4077
Fax: (214) 768-1611
Email: mshapiro@smu.edu

By: */S/ David W. Henderson*
David W. Henderson
Texas State Bar No. 24032292
dhenderson@equalrights.law
**ELLWANGER LAW LLLP**
400 S. Zang Blvd. Ste. 1015
Dallas, TX 75208
Telephone: (469) 998-6775
Facsimile: (469) 998-6775

***Attorneys for Christopher Rusanowsky***

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on this <u>23rd</u> day of May, 2022, a true and correct copy of the forego-

ing document was tendered for filing to the Clerk of the U.S. District Court for the Northern Dis-

trict of Texas using the Court's CM/ECF system.


                                       */S/ David W. Henderson*
                                       David W. Henderson