**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| CHRISTOPHER RUSANOWSKY, ) | |
| ) | |
| **_Plaintiff_**, ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. 3:22-cv-1132 |
| CITY OF DALLAS and SGT. ) | |
| ROGER A. RUDLOFF, individually ) | |
| and in his official capacity as a Dallas ) | |
| Police Department Police Officer, ) | |
| ) | |
| **_Defendants_**. ) | |
| ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT ROGER A. RUDLOFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Christopher Rusanowsky, by and through his attorneys, respectfully files his response to Defendant Sgt. Roger A. Rudloff's Motion for Summary Judgment, Dkt. 46, in which Defendant seeks summary judgment on all of Plaintiff's claims against him because, as Defendant argues, he is entitled to the defense of qualified immunity as a shield from suit.

As set forth in the accompanying brief, Plaintiff has sufficient evidence to establish, at a minimum, that there are genuine disputes of material fact, and that Sgt. Rudloff is not entitled to judgment as a matter of law, on Plaintiff's Fourth Amendment False Arrest, First Amendment Retaliation, and Fourth Amendment Malicious Prosecution claims against Sgt. Rudloff. Plaintiff therefore requests that the Court deny Defendant's Motion and enter an order finding Defendant Rudloff is not entitled to qualified immunity from suit.

1

Dated: June 5, 2023                           Respectfully Submitted,

David W. Henderson                            /s/ Thomas S. Leatherbury
Texas State Bar No. 24032292                  Thomas S. Leatherbury
dhenderson@equalrights.law                    Texas State Bar No. 12095275
J. Sebastian Van Coevorden                    Thomas S. Leatherbury Law, PLLC
Texas State Bar No. 24128101                  Cumberland Hill School Building
svancoevorden@equalrights.law                 1901 N. Akard Street
**ELLWANGER LAW LLLP**                        Dallas, Texas 75201
400 S. Zang Blvd. Ste. 600                    tom@tsleatherburylaw.com
Dallas, TX 75208                              Telephone: (214) 213-5004
Telephone: (469) 998-6775
Facsimile: (469) 998-6775                     /s/ Peter B. Steffensen
                                              Peter B. Steffensen
                                              Texas State Bar No. 24106464
                                              psteffensen@smu.edu
                                              SMU DEDMAN SCHOOL OF LAW
                                              FIRST AMENDMENT CLINIC
                                              P.O. Box 750116
                                              Dallas, TX 75275
                                              Telephone: (214) 768-4077
                                              Facsimile: (214) 768-1611

                                              ***Counsel for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

                                              /s/ Peter B. Steffensen
                                              Peter B. Steffensen

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| CHRISTOPHER RUSANOWSKY, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>CITY OF DALLAS and SGT. )<br>ROGER A. RUDLOFF, individually )<br>and in his official capacity as a Dallas )<br>Police Department Police Officer, )<br><br>*Defendants*. )<br>) | Civil Action No. 3:22-cv-1132 |

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT SGT. ROGER A. RUDLOFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

I.      INTRODUCTION & FACTUAL BACKGROUND .......................................................1

II.     PROCEDURAL HISTORY ...........................................................................................5

III.    LEGAL STANDARD .....................................................................................................6

IV.     RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS ..........7

   a.   Defendant and his Corroborating Witnesses Have Irreconcilably Different
        Memories of the Same Incident ..............................................................................8
        i.     Sgt. Rudloff's Declaration ...........................................................................8
        ii.    Cpl. Barrett's Declaration ..........................................................................11
        iii.   Cpl. Pillar's Declaration .............................................................................12
        iv.    All Three Declarations Make Conclusory Statements on Issues of Material Fact ........13

   b.   The Declarations and Defendant's Other Evidence are Replete with Factual Errors
        and Omissions that at Least Require a Trial. ....................................................15
        i.     Officer Thomas Phillip Hoffman was Never Present on the Scene of
               Plaintiff's Arrest. .......................................................................................15
        ii.    The Arrest Affidavit Contains Basic Factual Errors and is Based on an Officer
               Narrative that was Modified in 2021. .......................................................16
        iii.   Defendant Misinterprets a Statement in Plaintiff's Public Integrity Unit Interview and
               Mischaracterizes it as an Admission about Plaintiff's Location on the Highway. .......18
        iv.    Documentary Evidence Shows Sgt. Rudloff Arrested Plaintiff, Verbally Ordered the
               Arrests of Multiple People, and Physically Restrained Others. ...................19

V.      ARGUMENT ...............................................................................................................20

   A.   SGT. RUDLOFF IS NOT ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S FOURTH
        AMENDMENT FALSE ARREST AND FIRST AMENDMENT RETALIATION CLAIMS ...........20
        i.     Sgt. Rudloff Arrested Plaintiff. ..................................................................21
        ii.    Defendant's Evidence of Actual Probable Cause is Either False or Conclusory ..........22
        iii.   Defendant Did Not Have Arguable Probable Cause Because the Totality of the
               Circumstances Did Not Authorize Sgt. Rudloff to Arrest Plaintiff for Obstructing a
               Roadway .....................................................................................................25
        iv.    Sgt. Rudloff did not have Probable Cause to Arrest Plaintiff for Riot Participation or
               Violating the Texas Transportation Code. ..................................................31
        v.     Undisputed Evidence Shows that Defendant Arrested Plaintiff in Retaliation for
               Exercising his First Amendment Right to Record the Police in the Exercise of their
               Official Duties. ...........................................................................................35

   B.   DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FOURTH
        AMENDMENT MALICIOUS PROSECUTION CLAIM. ..........................................................42

   C.   DEFENDANT VIOLATED CLEARLY ESTABLISHED LAW WHEN HE ARRESTED AND
        RETALIATED AGAINST PLAINTIFF. ...................................................................................44

VI.     CONCLUSION ............................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Creighton*, 483 U.S. 635 (1987) ..................................................................7

*Armstrong v. Ashley*, 60 F.4th 262 (5th Cir. 2023) .......................................................43

*Audler v. CBC Innovis Inc.*, 519 F.3d 239 (5th Cir. 2008)............................................36

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) .......................................................28

*Bigford v. Taylor*, 834 F.2d 1213 (5th Cir. 1988) .............................................20, 21, 33

*BMG Music v. Martinez*, 74 F.3d 87 (5th Cir. 1996) ......................................................9

*Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004)....................................................28

*Byrd v. Cornelius*, 52 F.4th 265 (5th Cir. 2022)..............................................................7

*California v. Hodari D.*, 499 U.S. 621 (1991) ..............................................................22

*Castro v. McCord*, No. 05-21034, 2007 WL 4467566 (5th Cir. Dec. 18, 2007) .........36

*Club Retro, L..L.C. v. Hilton*, 568 F.3d 181 (5th Cir. 2009) ..................................passim

*Davidson v. City of Stafford, Tex.*, 848 F.3d 384 (5th Cir. 2017) ................7, 21, 24, 44

*Devenpeck v. Alford*, 543 U.S. 146 (2004)....................................................................33

*DIRECTV, Inc. v. Budden*, 420 F.3d 521 (5th Cir. 2005) ..........................................9, 23

*Dist. of Colum. v. Wesby*, --- U.S. ---, 138 S. Ct. 577 (2018)......................................21

*Drago v. State*, 553 S.W.2d 375 (Tex. Crim. App. 1977)..............................................33

*Evett v. DETNTFF*, 330 F.3d 681 (5th Cir. 2003)...........................................20, 27, 39

*Florida v. Harris*, 568 U.S. 237 (2013).........................................................................20

*Gonzalez v. Trevino*, 42 F.4th 487 (5th Cir. 2022)........................................................40

*Gordy v. Burns*, 294 F.3d 722 (5th Cir. 2002) ..............................................................42

*Hirschi v. State*, 685 S.W.3d 415 (Tex. Crim. App. 1984) (en banc) ...........................32

*Illinois v. Gates*, 462 U.S. 213 (1983)..........................................................................20

*Jones v. Parmley*, 465 F.3d 46 (2d Cir. 2006)................................................................27

*Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020)............................7

*Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002) ................................................36, 44

*Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288 (5th Cir. Mar. 12, 2020) ............................23

*Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945 (2018) ....................................40

*Maryland v. Pringle*, 540 U.S. 366 (2003) ........................................................21

*McBride v. State*, 359 S.W.3d 683 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd)........33, 34

*Melear v. Spears*, 862 F.2d 1177 (5th Cir. 1989) ................................................36

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019)........................................35, 40, 42

*Pierce v. Smith*, 117 F.3d 866 (5th Cir. 1997) ....................................................7

*Saucier v. Katz*, 533 U.S. 194 (2001) ............................................................7

*Sibron v. New York*, 392 U.S. 40 (1968) ................................................21, 26

*Terwilliger v. Reyna*, 4 F.4th 270 (5th Cir. 2021) ................................................21

*Thompson v. Clark*, 142 S. Ct. 1332 (2022)................................................42, 43

*Thompson v. Upshur Cty., Tex.*, 245 F.3d 447 (5th Cir. 2001) ....................................7

*Turner v. Lt. Driver*, 848 F.3d 678 (5th Cir. 2017) ................................................44

*Utah v. Strieff*, 579 U.S. 232 (2016)............................................................33

*Warner Bros. Ent., Inc. v. Jones*, 538 S.W.3d 781 (Tex. App.—Austin 2017), *aff'd*, 611 S.W.3d
1 (Tex. 2020) ..............................................................................44

*Ybarra v. Illinois*, 444 U.S. 85 (1979) ................................................20, 21, 27

## **Statutes**

Tex. Penal Code § 12.23................................................................33

Tex. Penal Code § 42.04................................................................41, 42

Tex. Transp. Code § 542.301 ...................................................................................33

Tex. Transp. Code § 552.005 ...................................................................................34

Tex. Transp. Code § 552.006 ..............................................................................33, 34

Tex. Transp. Code § 554.058(c)(3) ..........................................................................35

## **Rules**

Fed. R. Civ. P. 56(a) .................................................................................................7

## **Treatises**

Restatement (Second) of Torts § 654 (1977) ............................................................44

## I.      INTRODUCTION & FACTUAL BACKGROUND

On May 30, 2020, protesters in Downtown Dallas were marching together to speak out against George Floyd's murder and draw attention to a national epidemic of police violence against Black people. Groups of protesters moved all throughout the city that day. At approximately 8:25 PM, one of these groups marched west along Reunion Boulevard and up a raised embankment that led to the northbound lanes of I-35E.[1] Plaintiff Christopher Rusanowsky, a professional photojournalist, followed this group from the rear and documented their ingress onto the highway. From his vantage point, he watched and photographed as a number of protesters within this group moved onto the interstate's traffic lanes, spread out, and shut down traffic while moving northward.[2]

Not every member of the protest group followed these protesters onto the highway. Some stood or walked along the improved shoulder without obstructing traffic. Others stood and observed from the other side of a guardrail separating the raised embankment from the highway itself.[3] And though the protesters on the highway slowed traffic to a crawl, Plaintiff recalls that from his vantage point this group did not vandalize cars, throw objects, or engage in other violent behavior. If they had, Plaintiff would have tried to photograph them doing so. He captured no pictures reflecting that kind of violence at the time.[4]

Within minutes of the protesters blocking the highway, police arrived to disperse them. Plaintiff recalls a loud noise caused people to run off the freeway onto a grassy area nearby.[5]

---

[1] Dkt. 47, Pl. App'x 4 (¶ 17), 15-17 (hereinafter "Pl. App'x").

[2] *Id.* 4-5 (¶¶ 18-20), 19-27.

[3] *Id.* 5 (¶ 23), 23, 27; Pl. Resp. App'x 2 (¶¶ 7-13); *see* https://www.youtube.com/watch?v=pPVu6rsWBYs (at 5:27 to 5:47).

[4] Pl. Resp. App'x 2 (¶ 8).

[5] Pl. App'x 5 (¶ 25); *see also id.* 114 (¶ 9).

Plaintiff, who had been forced to briefly step onto the improved shoulder of the highway for his safety as a group of protesters amassed around him on the raised embankment, moved off the shoulder and stood behind a nearby pillar where he continued photographing as the protesters around him moved away from the direction of the noise.[6] Plaintiff's attention was drawn to an injured woman and a group of people assisting her. As Plaintiff moved to photograph her, he noticed police for the first time come into view and move towards this group.[7]

He looked on and took pictures as the group of approaching police, led by the Defendant, Sgt. Roger A. Rudloff, immediately began making arrests. Sgt. Rudloff's first target was a Black man wearing a red backpack who had been assisting the injured woman when police arrived.[8] Other protesters, including Jantzen Verastique and Parker Nevills, saw Rudloff and his team restraining people and approached to raise their objections to these arrests. Verastique in particular drew Rudloff's attention.[9] Plaintiff looked on and photographed as Rudloff moved in and shot this woman three times in the chest at point blank range with his pepperball gun.[10] Plaintiff kept photographing as Rudloff ordered this woman to the ground and told her she was under arrest.[11] Plaintiff followed Rudloff with his camera as Rudloff told another woman nearby that she was under arrest, and then turned to protester Parker Nevills, who was already in the process of being arrested by another officer.[12] Plaintiff watched as Rudloff instructed Nevills to get on the ground,

---

[6] *Id.* 5 (¶¶ 21-26).

[7] *Id.* 5-6 (¶¶ 27-32), 29-31.

[8] *Id.* 6 (¶¶ 33-34), 29-61.

[9] *Id.* 7 (¶ 35), 114-15 (¶ 11), 119-25.

[10] *Id.* 7 (¶ 35), 65-69; *see also id.* 126-131.

[11] *Id.*; *see also* Pl. App'x 158-59.

[12] *Id.* 7 (¶¶36-37).

then kneed him in the stomach, grabbed him by the hair, and forced him to the ground with the assistance of two other officers.[13]

Rudloff realized Plaintiff caught all this on camera. Even though it was clearly established at the time that Plaintiff had a First Amendment right to record the police in the public exercise of their official duties, Defendant nonetheless moved in to arrest Plaintiff, too.[14] In the process, he ignored the physical signs Plaintiff was a member of the press—such as Plaintiff's two large professional cameras and his prominently displayed press badge[15]—and explicitly disregarded Plaintiff's verbal pleas that he was a member of the press—"yeah, yeah, press, press, you're going to jail," Rudloff told Plaintiff.[16] Defendant then grabbed Plaintiff by the shirt—which completed the arrest—and threw him to the ground, where another officer, Cpl. David Pillar, restrained his hands, searched him, and moved him to a nearby police vehicle.[17] There, he was transported to a holding area, and then to jail, where he was held for 26 hours on a $300 bond. He was eventually released when his wife paid the bond.[18] Unbeknownst to Plaintiff, the charges against him were dropped, because investigating officers could not identify the officer responsible for arresting Plaintiff: Sgt. Rudloff.[19]

---

[13] *Id.* 7 (¶¶ 37-38), 73-83.

[14] *Id.* 7-8 (¶¶ 41-47), 115 (¶¶ 14-17), 147-155; *see also id.* 157 (at 1:01-1:04) (Rudloff off-camera saying "you're also under arrest get on the ground").

[15] *Id.* 155; *see also id.* 3-4 (¶¶ 11-13), 12-13.

[16] *Id.* 8 (¶¶ 45-46).

[17] *Id.* 8 (¶ 48-49); 89.

[18] *Id.* 8-9 (¶¶ 49-50).

[19] Dkt. 51-1, Def. App'x 16 (hereinafter "Def. App'x") (noting charges were dropped "By Detective"); Pl. Resp. App'x 4 (explaining charges against Nevills—charged under the same incident number—were dropped because "transporting officers were unable to identify who the arresting officers were").

Defendant lacked probable cause to arrest Plaintiff. Instead, Defendant arrested him out of a desire to retaliate against Plaintiff for recording Rudloff arrest and deploy force against at least four protesters in the span of approximately one minute. Neither Defendant nor any member of his team witnessed Plaintiff on the highway prior to encountering him photographing their actions on the grassy area beside it.[20] Nor did the totality of the circumstances known to these officers at the time—that some group of protesters had obstructed the highway—give them probable cause to arrest anyone in the area either. That is because documentary evidence shows the protest group nearby had largely been peaceful before police arrived, and contained a mix of people—some who had been on the highway, some who moved along the highway's improved shoulder, and some who never set foot on the highway at all.[21] If some of these protesters engaged in violent or riotous behavior, they were part of a much larger group who had not engaged in that conduct. At most, some subset of the protest group obstructed I-35's traffic lanes. But by the time Defendant and his team arrived at the grassy area to see protesters dispersing, there was a high likelihood that anyone they stopped had never actually obstructed traffic, or been on the freeway at all.[22] Nevertheless, Defendant and his team proceeded to arrest any protester in sight, without regard for that fact. And at the end, when Defendant realized that Plaintiff had photographed it all, Rudloff decided to arrest Plaintiff, too, in retaliation for him exercising his First Amendment rights.[23]

Defendant, of course, disagrees. He has moved for summary judgment on all of Plaintiff's claims against him, asserting the defense of qualified immunity. He claims that he had probable

---

[20] Pl. App'x 5-6, 9 (¶¶ 20-29, 52); *see also* Def. App'x 1, 4, 7 (Defendant and officer declarants' conclusory recollections of Plaintiff).

[21] *Id.* 5 (¶ 20), 23, 27; Pl. Resp. App'x 2 (¶¶ 7-13); *see* https://www.youtube.com/watch?v=pPVu6rsWBYs (at 5:27 to 5:47).

[22] Pl. App'x 5-6 (¶¶ 27-32).

[23] Pl. App'x 8-9 (¶¶ 44-47, 51), 114 (¶¶ 14-17), 147-55.

cause to arrest Plaintiff, and that his actions did not violate clearly established law at the time of Plaintiff's arrest. But the narrative of events that Defendant offers is contradicted by his own evidence. He offers his testimony and the testimony of two members of his team that day—Cpl. Russell Barrett and Cpl. David Pillar. None of them agree on what actually happened on May 30, 2020, and have virtually no recollection of Plaintiff that day. Moreover, a fourth story Defendant offers—the affidavit of Officer Thomas Hoffman—is based on a false narrative that places Plaintiff at a protest nearly a mile away from the scene of his arrest, nearly 90 minutes after Rudloff arrested him. And the scene that these officers recall—one of total violence and chaos—is contradicted by video and photographic evidence.

This Court does not need Plaintiff's evidence to find that there are genuine disputes of material fact within the record Sgt. Rudloff introduced. Add Plaintiff's evidence into the mix, and it becomes clear that Rudloff is not entitled to qualified immunity. His motion for summary judgment should be denied.

## II.     PROCEDURAL HISTORY

Plaintiff filed this suit on May 23, 2022. Dkt. 1. Defendant Rudloff filed his answer on July 13, 2022, and Defendant City of Dallas moved to dismiss on July 18, 2022. Dkts. 14, 15. On August 30, 2022, the Court entered an order regarding Sgt. Rudloff's invocation of qualified immunity as a defense to suit. Dkt. 23. Among other requirements, this order directed Plaintiff to file a FRCP Rule 7(a) Reply—which he did on September 29, 2022, Dkt. 26—stayed discovery, required Defendant Rudloff to inform the Court whether he intended to seek summary judgment on his qualified immunity defense, and if he did, set deadlines for the parties to ask for limited discovery and then move for summary judgment. Dkt. 23 at 1-2.

Rudloff informed the Court on October 31, 2022, that he intended to move for summary judgment. This triggered the discovery and summary judgment deadlines laid out in the Court's qualified immunity order. Plaintiff moved for limited discovery on November 21, 2022, and—given the impending summary judgment deadline—asked the Court to modify the deadline until 30 days after the parties exchanged discovery if Plaintiff's motion was granted, or 30 days after Plaintiff's motion for discovery was denied. Dkt. 33 at 3. The Court granted the motion on December 16, 2022. Dkt. 34. Then, on December 28, 2022, Magistrate Judge Horan—to whom the pending discovery motion had been referred, Dkt. 32—ordered the parties to meet and confer over the proposed discovery requests and file a joint report with the Court indicating what discovery they agreed was permissible at this juncture of the suit. Dkt. 35.

After two conferences, Judge Horan subsequently granted Plaintiff's motion to permit the discovery the parties agreed was permissible in their second joint report, Dkt. 39, and further ordered the parties to inform the Court when their disclosures were completed. This would trigger the parties' deadline to move for summary judgment, as set by the Court's order of December 16, 2022. *See* Dkt. 34. The parties so informed the Court on April 6, 2023, Dkts. 42, 43, which set the parties' deadline to move for summary judgment on May 8, 2023. *See* Fed. R. Civ. P. 6(a)(1)(C).

Plaintiff and Defendant both filed their motions on May 8. Dkts. 46, 49. Subsequently, the parties jointly moved for a seven-day extension to file their responses. Dkt. 54. The Court granted their motion, Dkt. 55, which reset the response deadline for June 5, 2023. Plaintiff files the instant response in compliance with that deadline.

## III.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "When considering a motion for summary judgment, the court views all facts and evidence in the light most favorable to the non-moving party." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 390 (5th Cir. 2017). Once a public official makes "a good-faith assertion of qualified immunity," the burden shifts to the Plaintiff to "show that there is a genuine dispute of material fact that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury." *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 329-30 (5th Cir. 2020). This includes making a showing that "the plaintiff's version of disputed facts [also constitutes] a violation of clearly established law." *Id.* at 330.

Qualified immunity "serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law." *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 456 (5th Cir. 2001). Where a defendant pleads qualified immunity in a Section 1983 action, the plaintiff bears the burden of rebutting the qualified immunity defense by "establishing that the official's allegedly wrongful conduct violated clearly established law." *Id.* (quoting *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997)). To determine the applicability of qualified immunity, "courts generally engage in a two-part inquiry asking: first, whether 'taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right;' and second, 'whether the right was clearly established.'" *Byrd v. Cornelius*, 52 F.4th 265, 271 (5th Cir. 2022) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In order for a right to be clearly established for qualified immunity purposes, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

**IV.     RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**

       *a. Defendant and his Corroborating Witnesses Have Irreconcilably Different Memories of the Same Incident.*

If Sgt. Rudloff, Cpl. Barrett, and Cpl. Pillar were adverse to each other in this lawsuit, their declarations alone would create genuine disputes of material fact. Each declaration contradicts each of the others on basic facts, and all are conclusory on the one fact that arguably matters the most: whether these officers actually witnessed Plaintiff on the highway. Analyzed together, these declarations show that Rudloff, Barrett, and Pillar can't even agree with each other on what happened on May 30, 2020 when Sgt. Rudloff arrested Plaintiff. What's more, when these declarations are tested against the photographic and video evidence in the record—almost all of which was in Defendant's custody long in advance of this lawsuit and was available to refresh the memories of the declarants—it becomes clear that all three of these declarations have misstated the chain of events that resulted in Sgt. Rudloff unconstitutionally arresting Plaintiff. These conflicts alone make the Rudloff, Barrett, and Pillar declarations untrustworthy. To show just how untrustworthy, Plaintiff discusses the narrative posed by each declaration below.

       i.  <u>Sgt. Rudloff's Declaration</u>

Sgt. Rudloff avers that on May 30, 2020, at an unspecified time, he was "informed on the police radio that I-35 in Dallas County was shut down due to individuals blocking the freeway." Def. App'x 1. As he traveled to the scene, Rudloff purportedly witnessed "what appeared to be hundreds of individuals blocking I-35 North." At some point—it is unclear when from his declaration—Rudloff and his team arrived "on the west side of I-35 South" where he "still saw individuals blocking I-35."[24] Rudloff and his team—which included Cpls. Pillar and Barrett—

---

[24] Minutes before, Sgt. Rudloff and his team were crossing another section of I-35 near Continental Avenue. There, bodycam footage of another officer documented Sgt. Rudloff firing his pepperball gun six times down into a crowd of protesters from an overpass without any clear provocation other than some profanity yelled in his direction. Pl. App'x 156.

"parked on the west side of I-35 North" and began moving eastward across the freeway in an attempt to push protesters off the freeway. As they crossed the freeway, Rudloff recalls people throwing projectiles and shouting insults at him and his group.[25] He also recalls that "[p]eople were told to disperse from the highway, but they did not." He does not identify who gave this order to disperse, or where that unidentified person was, nor does he aver that he personally ordered people to disperse.[26]

Rudloff then offers a solitary, standalone statement that he "witnessed a photographer on I-35 whom [he] later learned was Mr. Rusanowsky."[27] He offers no detail to support this recollection. He can't say where Plaintiff was in relation to him; how he zeroed in on Plaintiff out of the purportedly "hundreds" of people who had been obstructing the freeway; what Plaintiff was doing or where he was standing; how Plaintiff first came to his attention; what Plaintiff did after Rudloff purportedly saw him; or how much later he learned that Plaintiff was the photographer Rudloff allegedly observed. All Rudloff can say is that he saw him—the definition of a conclusory, self-serving statement that deserves no weight in the summary judgment calculus. *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005) (conclusory self-serving affidavits which attempt to create a fact issue over one's knowledge are "on unsteady ground") (citing *BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996))).

While on the highway, Rudloff states that he did not have clear direction from his supervisors about "what to do" with the people he and his team were pushing off the highway. He thus radioed into his supervisors, and was purportedly instructed by Chief Thomas Castro "to

---

[25] *But see* Pl. App'x 5 (¶ 20), 6 (¶ 32), 19-27; Pl. Resp. App'x 2 (¶¶ 8-13).

[26] *But see* Pl. App'x 5 (¶ 25); 114 (¶ 9).

[27] *But see id.* 5 (¶¶ 27-29).

round those folks up." Apparently acting on these orders, when Rudloff and his team made it to the grassy area on the east side of I-35, he and his team "began to take in custody [those] that were part of the same group that we observed had just been on the highway." But in the very next sentence Sgt. Rudloff undermines his own claim that the people he detained were people he actually observed on the highway—the "small group [his team] encountered on the grass *appeared* to be coming from the highway." *Id.* (emphasis added).

As the "coordinator/supervisor on the scene," Sgt. Rudloff allegedly "ordered several of the individuals who had been on the highway to lay on the ground" and "some complied."[28] He then explains how his attention was drawn to protester Parker Nevills, whom he restrained with a "knee strike" after Nevills allegedly refused several instructions to get on the ground.

According to Rudloff's recollection, he then heard "a screaming female voice" behind him, and turned to see "a large female" "charging" in his direction, who yelled "STOP" and adopted a "fighting stance."[29] He purportedly gave this woman "loud verbal commands for her to stop, she did not comply, and at some point [he] discharged [his] PepperBall launcher to gain compliance." He closes these recollections by noting that he also specifically saw Nevills and "the woman" on I-35 "prior to our direct interaction."

Rudloff then testifies that his "first direct interaction with Mr. Rusanowsky was after Cpl. Pillar had arrested him."[30] He recalls that "the first time I had any clue that Mr. Rusanowsky was supposedly a member of the press" was after Cpl. Pillar informed him that Plaintiff was "with the media." Despite being the "coordinator/supervisor on the scene," Rudloff did not fill out an arrest

---

[28] *But see id.* 5-8 (¶¶ 27-47); 37-83, 149-155, 158-59.

[29] *But see id.* 65, 119-127, 158.

[30] *But see id.* 8 (¶¶ 44-48); 115-16 (¶¶ 14-17); 147-155.

report for Plaintiff and, to this day, "has no idea who charged him with a crime or for what specific crime."

   ii.  <u>Cpl. Barrett's Declaration</u>

  Cpl. Barrett's recollection of events breaks from Sgt. Rudloff's in material ways. As Rudloff recounts, the protesters he arrested were already present in the grassy area by the time that Rudloff arrived there. Cpl. Barrett's memory is different. Barrett remembers that when he and the team reached the grass, "[a]nother group of individuals then came up from the freeway over the guardrails of I-35 towards us." Def. App'x 4. "This group," according to Barrett, "included the photographer I later learned was Mr. Rusanowsky, whom I also saw coming from the freeway over the guardrails."

  Both of these accounts cannot be true. Sgt. Rudloff's declaration places Plaintiff and the protesters they arrested in front of Rudloff, with him and his team following them in pursuit. Cpl. Barrett's declaration, on the other hand, implies that Rudloff and his team somehow got ahead of these protesters, reached the grass, and then turned to see Plaintiff and other protesters coming off the highway over the guardrail. Sgt. Rudloff's declaration indicates that the protest group was moving away from Rudloff and his team; Barrett's declaration says that this same group came over the guardrail of the highway *towards* Rudloff and his team. Rudloff's declaration says that he saw Plaintiff in front of him on the highway; Barrett's declaration says that he only saw Plaintiff after he and Rudloff's team had reached the grassy area and observed him coming off the highway "over the guardrails."[31]

  Cpl. Barrett's recollection of the sequence of events on May 30, 2020 also differs from Rudloff's. While Rudloff testified he restrained Parker Nevills, then turned to protester Jantzen

---

[31] *But see id.* 5-6 (¶¶ 25-29).

Verastique and shot her with his pepperball gun, Barrett testifies to just the opposite—that he witnessed Rudloff shoot Verastique first.[32] At around this time, he sees Nevills "[come] running back towards me in an aggressive manner and yelling in an aggressive manner." This apparently prompted Barrett to fire his weapon into the ground in front of Nevills as he approached.[33] He further notes that at this time "the crowd was still throwing materials at us and shouting obscenities."[34] It is then that Barrett says "DPD officers … began arresting those in the group that had come over the guardrails from the freeway," but makes no mention of Plaintiff's arrest or recalls any details about it.

### iii.   Cpl. Pillar's Declaration

Remarkably, Cpl. Pillar's recollection of May 30, 2020 differs from both Rudloff's and Barrett's memories. Like Rudloff, Pillar apparently recalls seeing Plaintiff in front of him on I-35. But Pillar recalls that the group they encountered in the grassy area "appeared to be coming *back* to the highway." Def. App'x 7 (emphasis added). This presents a third competing view among the testifying officers of the protest group's positioning and movement in relation to Rudloff and his team. As Rudloff remembers it, this group was already in the grassy area and moving away from the highway. As Barrett remembers it, he witnessed the group (including Plaintiff and Verastique) physically coming over the guardrails off the highway. And as Pillar remembers it, the group was

---

[32] In this respect, Barrett has the more accurate recollection. *See* Pl. App'x 7 (¶¶ 35-38), 65-83, 114-15 (¶¶ 11-13), 119-139.

[33] A cell phone video does show Nevills apparently running up to the scene right around the time Barrett fires his gun into the ground. Pl. App'x 156. Notably, though, Barrett fires his shot at the feet of several other individuals, at least two of whom were also recording the police with their cell phones. One of these people appears to be one of the group who had also been assisting the injured woman Plaintiff had photographed moments before. *Compare id.* at 0:02-0:03 *with* Pl. App'x 29, 31.

[34] *But see id.* 6 (¶ 32), 157-59 (no evidence of projectiles being thrown or landing in the vicinity of the arrests).

in the grassy area and moving toward the highway—not moving away from it as Rudloff recalls, or moving off it as Barrett recalls.

Pillar also claims sole responsibility for arresting Plaintiff, but says nothing specifically about Plaintiff's arrest—just that he "arrested him."[35] He apparently does not recall any details about Plaintiff's activities, movements, positioning in relation to the police or other protesters, whether they exchanged words before his arrest, or any other detail that would make Pillar's claim that he arrested Plaintiff non-conclusory.

Pillar's memory further diverges from Rudloff's and Barrett's. After Pillar recounts securing Plaintiff's belongings, he notes that he heard a commotion and witnessed Rudloff "deploy[] his PepperBall gun at someone" while the crowd around them "was still throwing materials at us and shouting obscenities." Once again, three different officers pose three different narratives: Rudloff says he restrained Nevills, shot Verastique, then encountered Plaintiff for the first time after Pillar had arrested him; Barrett says that Rudloff shot Verastique first and then restrained Nevills; and Pillar says Rudloff shot Verastique after Rusanowsky had already been placed under arrest.

Lastly, unlike his supervisor Sgt. Rudloff, Pillar apparently does remember what each of the people Rudloff and his team arrested were arrested for: "obstructing the highway and other crimes." *Id.* at 8.

### iv.   All Three Declarations Make Conclusory Statements on Issues of Material Fact

The Rudloff, Barrett, and Pillar declarations are untrustworthy for the simple reason that they advance conflicting accounts of the arrests of the protesters and Plaintiff. But they are

---

[35] *But see id.* 8 (¶¶ 44-48); 115-16 (¶¶ 14-17); 147-155.

additionally untrustworthy because on the most important detail—whether officers saw Plaintiff on the highway—no declaration offers facts that would make their recollections non-conclusory.[36] The most Sgt. Rudloff says is that he "witnessed a photographer on I-35 whom [he] later learned was Mr. Rusanowsky." *Id.* at 1. The most Cpl. Barrett says is that he saw a "group of individuals" come "up from the freeway over the guardrails of I-35 towards [him]" and that Plaintiff was among that group. *Id.* at 4. And the most Cpl. Pillar says is that he remembered "at one point, [Plaintiff] was in front of him on I-35."[37] None of them say they observed Plaintiff obstructing any part of the roadway, or that Plaintiff was among the group of people allegedly vandalizing property or throwing objects at police.

Additionally, even though each officer allegedly recalls seeing Plaintiff on I-35, apparently none of them can recall with any level of confidence or detail anything else about Plaintiff and his presence there or in the grassy area. Between the three declarations, none offers a single detail about Plaintiff between the time he was apparently seen on the highway and the time he was arrested. Rudloff recalls he saw him on the highway, and did not interact with him again until after Pillar allegedly arrested him. Barrett only recalls that he saw Plaintiff come over the guardrails of I-35. And Pillar merely notes that he recalled "seeing a man with two cameras" among the group in the grassy area—a fact which stood out to him "because members of the press usually stand to the side of crime scenes and police interactions with suspects." *Id.* at 7. Pillar then, without more, "arrested him." *Id.*

The conclusory statements and material omissions in these declarations are the kind of self-serving evidentiary material that the Fifth Circuit has held is not competent summary judgment

---

[36] *Contra* Pl. App'x 5 (¶¶ 19-29, 32); Pl. Resp. App'x 1-2.

[37] *But see* Dkt. 50 at 27 (Plaintiff was "[a]mong the sea of people" in the vicinity of the highway when Rudloff and his team came on the scene.).

evidence. As a result, the Court should accord them little weight in resolving the parties' cross-motions for summary judgment.

      b.   *The Declarations and Defendant's Other Evidence are Replete with Factual Errors and Omissions that at Least Require a Trial.*

The problems with Defendant's declarations point to larger issues endemic to Defendant's presentation of the evidentiary record. Before Plaintiff can adequately respond to the substance of Defendant's motion, Plaintiff highlights each of these additional concerns below.

      i.   <u>Officer Thomas Phillip Hoffman was Never Present on the Scene of Plaintiff's Arrest.</u>

A core contention in Defendant's claim of immunity is that Sgt. Rudloff had virtually no involvement in Plaintiff's arrest, and that responsibility really lies with other officers who independently witnessed Plaintiff's presence on the highway, arrested him, and brought charges against him. *See* Dkt. 50 at 12-13, 25, 27, 39. To support this argument, Defendant points to an affidavit, Def. App'x 13, that purports to describe the independent basis for probable cause held by two other officers—Officer Thomas Phillip Hoffman and Sgt. Scott Transou. Hoffman testifies that Sgt. Transou personally witnessed Plaintiff standing in a roadway and obstructing it after he issued orders to disperse and use the sidewalk over loudspeaker. Hoffman further testifies that as a result of Plaintiff's refusal to follow Sgt. Transou's orders, Plaintiff was arrested and transported to Dallas County Jail. Defendant identifies Hoffman (not Pillar) as the arresting officer, and avers that he and Sgt. Transou "gave the testimony that provided probable cause for arresting Plaintiff." Dkt. 50 at 39.

One problem: Officer Hoffman was never on the scene of Plaintiff's arrest. As Hoffman explained in an internal DPD statement he made on March 9, 2021, on the evening of May 30, 2020, he "responded to a command post outside of the area where several riots were occurring,"

where he was "directed to follow a bus of prisoners to Lew Sterrett [Jail] and *complete their arrest reports*." Pl. Resp. App'x 3. He thus had no personal knowledge of Plaintiff's conduct, let alone the conduct of any of the other arrestees he transported to the jail. That lends context to the factually false arrest affidavit that he swore to which, as discussed below, failed to show probable cause to charge Plaintiff with any offense.

ii.    <u>The Arrest Affidavit Contains Basic Factual Errors and is Based on an Officer Narrative that was Modified in 2021.</u>

The arrest affidavit (Def. App'x 13) sworn to by Hoffman—and offered by Defendant as evidence that probable cause was conclusively established—*on its face* fails to allege probable cause to arrest Plaintiff, and it never should have been presented to a magistrate judge. In it, Hoffman testifies that "at approximately 10:00 PM" Plaintiff was observed obstructing a roadway at 1700 Commerce Street. There are two (emphatically fatal) issues with that testimony: *first*, 1700 Commerce Street is nearly three-quarters of a mile away from where Plaintiff was photographing the protests that evening—Plaintiff was thus wrongly accused of conduct that allegedly took place at a part of the protests he was nowhere near; and *second*, Plaintiff was arrested at approximately 8:35 PM—almost an hour-and-a-half *before* the warrant affidavit alleges he obstructed a roadway.[38]

Hoffman's testimony, based on Transou's alleged observations, is therefore not just untrustworthy, but false. That Defendant relies on this affidavit as proof positive of the existence of probable cause is an insurmountable problem for him—a problem which is accentuated by Defendant's other declarations' failure to mention Hoffman or Transou ever; nor did Defendant

---

[38] *See* Pl. App'x 7 (¶ 39).

16

produce anything in the limited discovery Plaintiff received indicating Hoffman or Transou were ever in the vicinity of I-35 when Plaintiff was arrested.

Other indicia in supporting arrest reports, incident reports, and discharge paperwork raise cause for significant concern about the veracity of the statements made in the Hoffman affidavit. For one, an incident report written by Hoffman notes that Sgt. Transou witnessed Plaintiff and three others—Parker Nevills, Yolanda Dobbins, and Maggie Little—all obstructing a roadway, willingly participating in a riot, and refusing to follow orders. Def. App'x 252. This report served as the factual basis for Plaintiff's arrest affidavit. *Compare id. with* Def. App'x 13. The report and the arrest affidavit were both affiliated with Incident Number 098514-2020. Subsequently, a June 15, 2020 "Release Charge" document dropping the charges against Parker Nevills—which were affiliated with the same incident number—explains that "transporting officers were unable to identify who the arresting officers were." Pl. Resp. App'x 4. In other words, investigative personnel did not consider either Hoffman or Transou to be the arresting officers who had personal knowledge of Nevills's conduct and, by implication, the conduct of any other person—including Plaintiff—affiliated with Incident Number 098514-2020.

What's more (and more concerning), the Hoffman narrative which served as the basis for Plaintiff's arrest affidavit, was "updated" on March 19, 2021—almost ten months after Plaintiff's arrest—by Ruben Rodriguez. Def. App'x 252. Though it is unclear from the face of the record what changed, an earlier version of this incident narrative—using the same Incident Number, 098514-2020—showed that, as of July 7, 2020, a fifth person—Keevon Love—was affiliated with this incident who is no longer reflected on the "updated" report filed by Defendant. *Compare* Def. App'x 252 *with* Pl. App'x 108-09. In other words, in the ensuing months after Plaintiff's arrest, one of the five people that Transou purportedly witnessed obstructing a roadway alongside

17

Plaintiff is no longer reflected in the Dallas Police Department's official arrest records—records which Hoffman wrote and swore to, and which were presented to a magistrate judge to obtain a probable cause finding in order to detain Plaintiff for 26 hours.

Without further discovery, Plaintiff cannot identify for certain the reason for this alteration. For purposes of this motion, however, the Hoffman affidavit is an untrustworthy record containing false statements of fact that the Court should disregard entirely, and factual questions about the existence of probable cause predominate.

      iii.   <u>Defendant Misinterprets a Statement in Plaintiff's Public Integrity Unit Interview and Mischaracterizes it as an Admission about Plaintiff's Location on the Highway.</u>

Defendant also cherry-picks a line from Plaintiff's interview with an officer from Dallas Police Department's Public Integrity Unit, and miscasts it as an admission that Plaintiff himself was situated on the traffic lanes of the highway. Dkt. 50 at 26, 28. In this interview, Plaintiff recounted his positioning in relation to protesters who marched onto I-35. He explained, "I was staying a little bit behind photographing what was going on, kind of like, within the cars that were stopped on the freeway." Def. App'x 255 at 9:21:42-9:22:15. Defendant interprets this to mean that Plaintiff himself was standing "within the cars that were stopped on the freeway."

That reading misinterprets Plaintiff's intended meaning, which is that he was *photographing* what has happening "within the cars that were stopped on the freeway"—not that he himself was standing in the traffic lanes. Pl. Resp. App'x 1-2 (¶¶ 2-6). Defendant nonetheless fixates on this single sentence and frames it as an admission that Plaintiff entered the traffic lanes of the freeway. Dkt. 50 at 26, 28. To clarify, Plaintiff maintains that he never set foot on the traffic lanes of I-35, and for the brief time that he stood on the freeway's shoulder, he stood along the

shoulder's outer edge away from traffic, and was careful not to cause any obstruction during his exceedingly brief presence there.

    iv.  <u>Documentary Evidence Shows Sgt. Rudloff Arrested Plaintiff, Verbally Ordered the Arrests of Multiple People, and Physically Restrained Others.</u>

Defendant also casts himself as merely a "coordinator/supervisor on the scene," and not *the* person who initiated and presided over the arrests of Plaintiff and at least four others in the space of approximately a minute. But documentary evidence demonstrates that Defendant was the primary aggressor and initiator of almost every single arrest. For one, video evidence shows that Defendant specifically ordered the arrest of Jantzen Verastique after shooting her with his PepperBall gun, and the arrest of another nearby protester. *See* Pl. App'x 158 (RUD 00112); Pl. App'x 157 (RUD00109 at 01:01-01:05) (Rudloff heard off-camera saying "You're also under arrest, get on the ground" to Plaintiff").

Other photographic evidence shows that Rudloff simply began arresting people the moment he arrived on scene. For example, evidence Plaintiff attached to his motion shows that Rudloff's first target for arrest was a Black man with a red backpack—whom Plaintiff had just documented assisting an apparently injured woman. This photographic evidence shows that Rudloff approached this man from his right flank, immediately laid hands on him and brought him to the ground within seconds. Pl. App'x 31-62. As Plaintiff and others continued documenting the scene, they captured Rudloff as he moved around the small group of people nearby and acted to restrain and arrest each of them—verbally, physically, or both—before finally turning to Plaintiff and arresting him as well. Pl. App'x 65-83, 119-155.

This photographic evidence also undermines Rudloff's accounting of Plaintiff's arrest—particularly that his first interaction with Plaintiff was after Cpl. Pillar handcuffed Plaintiff. Pl. App'x 147-155. Rather, the record demonstrates that, of all the officers on scene, Rudloff was the

first to initiate any interaction with Plaintiff, *after* Plaintiff had captured Rudloff's conduct on film and before Cpl. Pillar ever came into physical contact with Plaintiff. *Id.*; *see* Pl. App'x 8-9, ¶¶ 43-48; Pl. App'x 115-16, ¶¶ 14-17.

### V.   ARGUMENT

#### a.   SGT. RUDLOFF IS NOT ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S FOURTH AMENDMENT FALSE ARREST AND FIRST AMENDMENT RETALIATION CLAIMS

"The 'long-prevailing' constitutional standard of probable cause embodies 'the best compromise that has been found for accommodating [the] often opposing interests in safeguard[ing] citizens from rash and unreasonable interferences with privacy and in seek[ing] to give fair leeway for enforcing the law in the community's protection." *Ybarra v. Illinois*, 444 U.S. 85, 95-96 (1979). Probable cause is therefore "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

"Probable cause exists when the facts and circumstances within the arresting officer's knowledge, or of which he has reasonably trustworthy information, are sufficient to occasion a person of reasonable prudence to believe an offense has been committed." *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003) (quoting *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988)). That standard is not "toothless." *Bigford*, 834 F.2d at 1218. It requires "a reasonable basis under the circumstances for reaching" the conclusion that a crime has been committed, "and for acting on it." *Id.*

"The facts must be known to the officer at the time of the arrest; post-hoc justifications based on facts later learned cannot support an earlier arrest. *Club Retro, L..L.C. v. Hilton*, 568 F.3d

181, 204 (5th Cir. 2009) (citing *Sibron v. New York*, 392 U.S. 40, 62-63 (1968)). "Courts must look to the 'totality of the circumstances' and decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer' demonstrate 'a probability or substantial chance of criminal activity.'" *Terwilliger v. Reyna*, 4 F.4th 270, 282 (5th Cir. 2021) (quoting *Dist. of Colum. v. Wesby*, --- U.S. ---, 138 S. Ct. 577, 586 (2018)). In assessing the totality of the circumstances, police "also may not disregard facts tending to *dissipate* probable cause." *Bigford*, 834 F.2d at 1218 (emphasis added).

True, probable cause is not a "high bar," but "the belief of guilt must be particularized with respect to the person to be searched or seized." *Terwilliger*, 4 F.4th at 282 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)); *accord Club Retro*, 568 F.3d at 204 (citing *Ybarra*, 444 U.S. at 91)). An officer is not entitled to qualified immunity if "there was no actual probable cause for the arrest and the officers were objectively unreasonable in believing there was probable cause for the arrest." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 381 (5th Cir. 2017). To pierce the immunity shield then, "plaintiffs must allege facts permitting an inference that defendants lacked arguable (that is, reasonable but mistaken) probable cause for the arrests." *Club Retro*, 568 F.3d at 207.

For the following reasons, Defendant lacked actual and arguable probable cause to arrest Plaintiff on May 30, 2020. He is therefore not entitled to qualified immunity on Plaintiff's Fourth Amendment false arrest and First Amendment retaliation claims.

### i.   Sgt. Rudloff Arrested Plaintiff.

A threshold matter Plaintiff must address is Defendant's claim that he was not the arresting officer and did not interact with Plaintiff until after Plaintiff had been arrested by Cpl. Pillar. *See* Dkt. 50 at 12, 13, 14, 15, 38, 39; Def. App'x 2, 7. As discussed above, record evidence

demonstrates that, of all the officers on scene, Rudloff was the first to interact with Plaintiff and physically lay hands on him. Pl. App'x 8 (¶¶ 44-48), 115-16 (¶¶ 14-17), 153, 155. To the extent Defendant is arguing that Plaintiff's arrest was not actually completed until Cpl. Pillar handcuffed him, that argument contradicts black letter Fourth Amendment law holding that "the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient" to constitute an arrest. *California v. Hodari D.*, 499 U.S. 621, 624 (1991). The photographic evidence shows Sgt. Rudloff was the first officer to interact with Plaintiff and place hands on him. Pl. App'x 153, 155, alone are sufficient to establish that Defendant was Plaintiff's arresting officer on May 30, 2020.

> ii.  <u>Defendant's Evidence of Actual Probable Cause is Either False or Conclusory.</u>

Turning to the substance of Defendant's motion, Sgt. Rudloff's leading point is that he is entitled to qualified immunity because four individual officer witnesses saw Plaintiff on the highway. Dkt. 50 at 25. At least one of these accounts is false. The other three are conclusory and should be accorded little weight.

As Plaintiff explained, Sgt. Scott Transou's observations—adopted in the affidavit of Officer Thomas Hoffman—are deeply flawed. Sgt. Transou recalls seeing Plaintiff obstructing a roadway nearly ninety minutes after he was arrested, in an area nearly a mile away from the site of Plaintiff's actual arrest. Def. App'x 13. Hoffman, who swore to Sgt. Transou's account, later explained that he was never at the scene of Plaintiff's arrest, and had no personal knowledge of it. Pl. Resp. App'x 3. Hoffman acknowledged this in a statement given as part of an internal DPD Public Integrity Unit investigation. He explained that, on May 30, 2020, he simply responded to a holding area, where he was ordered to transport a group of arrestees, including Plaintiff, to jail and fill out their arrest reports. *Id*. Other records gathered as part of this investigation confirmed that

neither Hoffman nor Transou was the arresting officer in the incident in which Plaintiff, Parker Nevills, and three others were jointly charged. Pl. Resp. App'x 4. The charges were therefore dropped due to an inability of investigating officers to identify the officers who *actually* arrested Nevills and, implicitly, Plaintiff. *Id.*

Defendant also relies on his testimony, and the testimony of Cpls. Barrett and Pillar, to establish they actually witnessed Plaintiff on the highway before his arrest. But these statements are the definition of conclusory—without any level of detail or specificity, they state that each officer saw Plaintiff on the highway. *See Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 292 (5th Cir. Mar. 12, 2020) ("Broad legal or factual assertions in an affidavit that are unsupported by specific facts are generally held to be conclusory") (collecting cases). Of all the details that these three officers offer, none of them is able to provide more than non-conclusory statements about their recollection of Plaintiff's presence on the highway specifically—and each should be disregarded because of it. *See DIRECTV, Inc.*, 420 F.3d at 531.

They should also be disregarded for the additional reason that these officers' more detailed statements raise further questions about their recollections. For example, Defendant recalls with certainty that he saw Plaintiff on the highway, but apparently forgets that he interacted with Plaintiff before Pillar ever did, or that he shot protester Verastique before arresting protester Nevills, and not the other way around. Barrett recalls that he saw Plaintiff coming over the guardrail, even though Rudloff testified the group he and his team encountered was already in the grassy area. And Pillar, like Rudloff, remembers he saw Plaintiff in front of him on the highway, but recalls the group that included Plaintiff was moving back towards (not away from) the highway. *Compare* Def. App'x 1-2 *with* 4-5 *with* 7-8.

Plaintiff's own evidence also erodes these officers' narratives. Plaintiff recalls that he documented the protests on the highway from their rear, where it would have been "extremely unlikely, if not impossible" for police to have seen him through the throng of "hundreds" that Rudloff and his team purportedly witnessed on the highway. Pl. App'x 6, ¶ 29; Def. App'x 1, 4, 7. He only stepped onto the highway's improved shoulder out of concern for his personal safety, and remained there for approximately one minute. *Id.* ¶ 23. Video and photographic evidence shows a group of protesters observing from the improved shoulder and the other side of the highway's guardrail, indicating that the protest group included a mix of people who entered the highway and people who did not. Pl. App'x 23, 27; Pl. Resp. App'x 2 (¶¶ 7-13).[39] This would have been apparent to Rudloff, Barrett, and Pillar if they did in fact see Plaintiff on the far-east shoulder (Plaintiff maintains they did not), as Rudloff and the others crossed I-35 from west to east.

Finally, Defendant's conclusory testimony that he, Barrett, and Pillar saw Plaintiff on the highway—to the extent it can be credited at all—does not dispute Plaintiff's testimony that during the brief moment he set foot on the improved shoulder, he never stepped onto the highway's traffic lanes or obstructed traffic. Pl. App'x 5 (¶ 23), Pl. Resp. App'x 1 (¶¶ 2-6). In other words, even accepting Defendant's proffered testimony as true, he and his fellow officers do not dispute Plaintiff's assertion that he remained on the improved shoulder at all times and did not set foot onto the traffic lanes. It is therefore undisputed that, if Defendant and his officers saw Plaintiff at all, they saw him on the improved shoulder where he was not obstructing the roadway. *See Davidson*, 848 F.3d at 393 (holding probable cause to arrest someone for obstructing a roadway requires information indicating there was actual obstruction—meaning "stopping or preventing" a person from accessing a roadway).  For the reasons set forth below, this undermines Defendant's

---

[39] *See* https://www.youtube.com/watch?v=pPVu6rsWBYs (at 5:27 to 5:47).

argument that he had arguable probable cause to arrest Plaintiff under the totality of the circumstances known to Rudloff at the time.

> iii.   Defendant Did Not Have Arguable Probable Cause Because the Totality of the Circumstances Did Not Authorize Sgt. Rudloff to Arrest Plaintiff for Obstructing a Roadway.

Defendant's totality-of-the-circumstances argument is likewise thin and conclusory, controverted by other record evidence, and partly based on a misreading of Plaintiff's own statements. Defendant argues he, Barrett, and Pillar all agree that a chaotic and violent scene on the highway caused Rudloff's team to chase protesters off I-35 and onto the grassy area, where they came upon Plaintiff. Dkt. 50 at 26. Without more, Defendant asserts that it was proper to arrest Plaintiff for his mere presence in the grassy area adjacent to the highway, on the presumption that anyone in that area had been unlawfully obstructing the highway just moments before.

Notwithstanding the factual disagreements that make up the officer declarants' collective narrative, *see* Section IV.a, *supra*, other issues undermine Defendant's claim that the totality of the circumstances permitted Sgt. Rudloff to arrest Plaintiff. For one, Defendant's testimony about Plaintiff's presence and positioning on and off the highway is so limited that he cannot even say for sure whether Plaintiff was "in" the group or "adjacent" to it—a meaningful distinction in the fact-bound inquiry of the probable cause analysis. That Defendant cannot say which undercuts his argument that he possessed specific articulable facts that supported Plaintiff's arrest. *Club Retro*, 568 F.3d at 204 ("The facts must be particularized to the arrestee.").

Defendant's conclusory testimony is also contradicted by Plaintiff's testimony. Plaintiff explained that on May 30, 2020, he always maintained a safe distance from protesters and police specifically for his safety and to avoid the appearance that he was affiliated with the protest groups. Pl. App'x 4-9 (¶¶ 13, 21-23, 30, 35, 41, 52); Pl. Resp. App'x 1-2 (¶¶ 2-6). Photographs and videos

of Plaintiff confirm this account. They show that he documented the scene of the arrests on the grassy area from a safe distance where he could not be accused of interfering with the police activity unfolding in front of him. Pl. App'x 121, 127-128, 133, 135, 158, 159. Plaintiff's conduct when documenting the arrests comports with his conduct prior to reaching the grassy area—he tried to keep physical separation from the protesters when he was surrounded by an amassing group on the raised embankment adjacent to I-35, he avoided the traffic lanes while moving along the improved shoulder, and he stood back as he documented the small group of people who Defendant and his officers set their sights on for arrest. Pl. App'x 5-6, 9 (¶¶ 20-30, 52).

Sgt. Rudloff also points to a recorded statement Plaintiff gave to an officer of DPD's Public Integrity Unit as evidence that Plaintiff—despite his sworn statement to the contrary—"placed himself on the highway and dead center among the individuals who had just left the highway after obstructing it[.]" Dkt. 50 at 26. As Plaintiff noted above, this conclusion is based on Rudloff's misreading of Plaintiff's interview: Plaintiff intended to convey that he photographed the scenes happening "within the cars that were stopped on the freeway." *Id.* (quoting Def. App'x 255); *see* Pl. Resp. App'x 1 (¶¶ 2-6). Pictures taken by Plaintiff in the record reflect his accounting of the scenes he was referring to. *See* Pl. App'x 19-25; *see also id.* 5, ¶ 20.

By focusing on this misinterpreted statement, Defendant obfuscates what really matters in the totality-of-the-circumstances argument—what were the totality of circumstances known to *Rudloff and his officers at the time Rudloff arrested Plaintiff. See Club Retro*, 568 F.3d at 204 ("The facts must be known to the officer at the time of the arrest; post-hoc justifications based on facts later learned cannot support an earlier arrest." (citing *Sibron v. New York*, 392 U.S. 40, 62-63 (1968))). Defendant offers almost nothing. He spotlights his erroneous interpretation of Plaintiff's recorded statement—something that neither Rudloff nor the other officer declarants say

they had specific knowledge of at the time. He then concludes that, "[a]mong the sea of people, a reasonable officer could have concluded that Plaintiff … had been a participant in the obstruction that just occurred." In Defendant's own words, then, he believes he had probable cause to arrest Plaintiff simply because of his proximity to a group of people collectively suspected of criminality.

That contradicts well-settled Fourth Amendment principles. Probable cause requires not only that the "facts and circumstances within the arresting officer's personal knowledge … are sufficient to occasion a person of reasonable prudence to believe an offense has been committed." *Evett*, 330 F.3d at 688. Those facts must also be "particularized to the arrestee." *Club Retro*, 568 F.3d at 204 (citing *Ybarra*, 444 U.S. at 91). As the Supreme Court observed in *Ybarra*, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause . . . ." *Id.* The particularity requirement "cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another . . . ." *Id.*

Those particularity principles are not lessened in the context of protests and mass arrests. When confronted with instances of alleged criminality by some within a larger group—such as the obstruction, vandalism, and throwing of projectiles purportedly experienced by Defendant and his team—police still are not given carte blanche to cast aside individual rights, especially the fundamental requirement that each arrest be supported by facts particularized to the individual arrestee. The Fourth Amendment's particularity requirement serves as a critical safeguard against law enforcement overreach in those circumstances. Otherwise, the criminal activities of some among the group could be used to justify the arrest of entire groups to prevent individual offenders from escaping accountability. *See Jones v. Parmley*, 465 F.3d 46, 60-61 (2d Cir. 2006) (when defendants conceded that they could not identify which members of a demonstration had protested

27

on an adjacent interstate, they could not "have reasonably thought that indiscriminate mass arrests without probable cause were lawful" under the circumstances); *Barham v. Ramsey*, 434 F.3d 565, 575 (D.C. Cir. 2006) (rejecting as justification for a mass arrest the fact that "allegedly illegal activities [were] observed *near* the scene of the arrest *before* 'demonstrators' converged on" the place where they were arrested) (emphasis in original); *see also Bourgeois v. Peters*, 387 F.3d 1303, 1311 (11th Cir. 2004) ("The text of the Fourth Amendment contains no exception for large gatherings of people.").

The facts as framed by Defendant betray the lack of contemporaneous, particularized knowledge held by Defendant and his team. Sgt. Rudloff and his officers offer only conclusory, untrustworthy testimony that they recall seeing Plaintiff on the highway. If Defendant were to have it his way, that fact and Plaintiff's mere proximity to people who Defendant and his team also reportedly saw on the highway—or moving away from the highway, or coming over the guardrail, or moving toward the highway, depending on which, if any, of the officer declarations are to be believed—was enough to support an inference that it was reasonably likely Plaintiff had committed the offenses of obstructing a roadway, or participating in a riot, or walking on the wrong side of the road.[40]

Defendant's claimed basis for arresting Plaintiff is also undermined by the officers' testimony about their decision-making in that moment. Faced with the choice between arresting people they saw actively engaging in criminal activity, and arresting people they only assumed had been, Defendant and his team chose to arrest the latter group. That is the inescapable

---

[40] Which it is, Defendant cannot say. Despite arresting Plaintiff, he has no recollection of who charged Plaintiff with a crime, or "what specific crime, if any[,]" Plaintiff was charged with. Nor did he fill out any arrest reports regarding Plaintiff. Def. App'x 2. *But see Barham*, 434 F.3d at 574 (criticizing arresting officer for failing to "ascribe misdeeds to the specific individuals arrested").

conclusion from the testimony of Defendant and his team, who purportedly witnessed people vandalizing property and throwing projectiles at them, but did not arrest anyone for that conduct.[41]

A striking moment described by Cpl. Barrett exemplifies this: Barrett recalls that while he stood in the grassy area, he was focused on a group "that was using a wall as cover while throwing rocks, bottles, and other material at us." Despite that reportedly acute threat to Barrett's safety and the safety of the officers around him, Defendant and his team instead decided to focus on a group giving aid to an injured woman. Pl. App'x 5 (¶¶ 26-35); *id.* 31-61. Defendant's team members testify they nonetheless completed these arrests while "the crowd was still throwing materials at us and shouting obscenities." Def. App'x 4, 8; *contra* Pl. App'x 6 (¶ 32). That certainly contradicts another aspect of Defendant's testimony: that his "entire goal for this interaction was to get those obstructing the freeway off the freeway and to prevent further property destruction or potential violence." Def. App'x 2. Allegedly being targeted with actual violence, Rudloff and his team focused on arresting people who posed a demonstrably lesser threat.

Finally, Defendant and the officer declarants paint a picture of a violent, out-of-control scene—one where "hundreds of rioting protesters swarmed I-35, stopping traffic and defac[ing] property;" where "under a hail of thrown debris and chants of 'fuck the police,' the officers chased the protestors off the highway onto a grassy area[.]" Dkt. 50 at 26. In Defendant's estimation of the circumstances, it was fair for Rudloff and his officers to arrest Plaintiff because the alleged criminality Defendant and his officers claim to have seen on the highway was so extensive that they had probable cause to arrest him and everyone else near the freeway.

---

[41] Video evidence calls into question Rudloff's claim of violence as well. Recordings of Rudloff and his team in the lead-up to and during the arrests do not show any projectiles being thrown at them or landing in their vicinity. During these recordings, Rudloff and his team appear unconcerned with any external threats posed by nearby protesters. *See* Pl. App'x 156-159.

Defendant's depiction of this scene is not reflected in video evidence, the photographs Plaintiff took, or Plaintiff's memory of those same events. Certainly, protesters obstructed the highway—that much is undisputed. But video evidence and Plaintiff's photographs paint a much more nuanced picture of the group who protested on and near the highway. A contemporaneous cell phone video included in a WFAA news report of the protests on I-35 shows a group of protesters walking calmly on the interstate and not apparently engaging in dangerous or riotous behavior.[42] Many of the protesters Plaintiff photographed can be seen with their hands up, holding signs, and not engaging with vehicles. Pl. App'x 19-27. At least some portion of this group can be seen standing on the improved shoulder not obstructing the highway's traffic lanes at all. *See* WFAA Video at 5:37; Pl. App'x 23. Other protesters can be seen standing on the other side of the barrier separating the highway's improved shoulder from the raised embankment. *Id.*; Pl. App'x 27. And by the time police arrived to disperse protesters, the obstruction was a short inconvenience to drivers on the road—Plaintiff's witness Skye Seipp recalls that the protest on the highway lasted not more than five to ten minutes. Pl. App'x 114 (¶ 9). In the grassy area adjacent to the highway, Plaintiff also does not recall any objects being thrown at the police. As he recounts, "[i]t is unlikely this happened because any projectiles being thrown in our direction would have run the risk of hitting me and other people too." Pl. App'x 6 (¶ 32).

Plaintiff's evidence contradicts Defendant's narrative of mass lawlessness in that moment. His photographs and other video evidence show a mix of people who were on the highway obstructing traffic, others who stood on the improved shoulder avoiding any sort of obstruction, and others who never set foot on the roadway at all. This mix of law-abiding protesters and people who set foot into the traffic lanes of the interstate would have been apparent to Defendant and his

---

[42] *See* https://www.youtube.com/watch?v=pPVu6rsWBYs; Pl. Resp. App'x 2 (¶¶ 7-13).

team of officers as they crossed the interstate to disperse the protesters. It therefore would have been apparent to a reasonable officer in Sgt. Rudloff's position that, after people dispersed, arresting any one of them just because they were in the vicinity of the interstate carried with it an unacceptable probability that he was arresting someone who never actually violated any law. This is precisely the kind of intolerable risk that makes the Fourth Amendment's particularity requirement just as important in the mass arrest context. And it is precisely why Rudloff and his team were required to have contemporaneous, specific knowledge that each person they arrested had been actually obstructing traffic on the highway to validly arrest them.

Defendant offers no *particularized* facts to support his probable cause argument. He and his fellow officers generally recall—contrary to documentary evidence—scenes of mass violence and unlawfulness on the interstate; and he and his fellow officers remember—without a shred of detail—seeing Plaintiff present there. From that, Defendant concludes he had probable cause to arrest Plaintiff when Rudloff and his officers encountered him off the highway in the grassy area photographing their activities. The Fourth Amendment demands more, and Rudloff breached those constitutional constraints by arresting Plaintiff.

    iv.   <u>Sgt. Rudloff did not have Probable Cause to Arrest Plaintiff for Riot Participation or Violating the Texas Transportation Code</u>.

If there was not probable cause to arrest Plaintiff for obstruction of the highway, Defendant falls back on two other offenses for which he claims he also had probable cause to arrest Plaintiff under the circumstances. Dkt. 50 at 27-31. For the first offense—riot participation, Tex. Penal Code § 42.02—Defendant points to Sgt. Scott Transou's post-arrest, false testimony that placed Plaintiff nearly a mile away from where he was arrested, nearly 90 minutes after he had already been taken into custody. Transou's observations deserve no credit. Moreover, Plaintiff's video and photographic evidence and testimony that any scenes of alleged lawlessness on the highway were

attributable to a smaller subset of the protest group—rather than the group as a whole—further cut into Defendant's claim that he had probable cause to arrest Plaintiff.

Even against this backdrop, that Defendant and his officers also claim to have seen Plaintiff on the highway at the time does not get them over the finish line. Their conclusory statements—if they can be credited at all—fail to say at all what particularized facts led them to believe Plaintiff participated in an "assemblage" as the offense requires. *See Hirschi v. State*, 685 S.W.3d 415, 418 (Tex. Crim. App. 1984) (en banc) ("[T]he statute requires that the actor participate with those assembled *knowing* that the assemblage is resulting in unlawful conduct.") (emphasis in original). The vague recollections of Rudloff, Barrett, and Pillar all note that they saw him, but fail to say whether or how he was a participant in the rioting group or whether he was separate from it. *See also* Dkt. 50 at 26 (claiming Plaintiff was "in and/or adjacent"—but not specifying which—"to the group that had just hurried away from the highway").

No evidence Defendant offers permits an inference that he could have considered Plaintiff to be a participant in a riot under the totality of the circumstances. Plaintiff's testimony establishes that, at all times, he kept clear distance and separation from the protest group so that he would not be confused by police as being a member of this group. Pl. App'x 4-5, 7 (¶¶ 13, 21-23, 35, 41, 52). Photographic and video evidence shows that he in fact kept this distance. Pl. App'x 119, 121, 127, 129, 133, 135, 158, 159. The visual indicators signifying that Plaintiff was a journalist—such as his clearly displayed press badge, and the two large cameras he carried[43]—would have also made clear to a reasonable officer that Plaintiff was present to document the protests, not participate in them. And even if the outward visual indicators did not make Plaintiff's lack of role in the protest "assemblage" clear, Plaintiff's verbal pleas to Defendant that he was a member of the press and

---

[43] Pl. App'x 155; *see also id.* 3, 8 (¶¶ 11, 45), 12-13.

his attempts to show Defendant his press badge would have driven the point home to a reasonable officer. Pl. App'x 8 (¶¶ 44-46). *See Bigford*, 834 F.2d at 1218 (in assessing the totality of the circumstances, police "also may not disregard facts tending to *dissipate* probable cause.").

At bottom then, Defendant scrambles to identify any other crime for which he could have had probable cause to arrest Plaintiff. *Devenpeck v. Alford*, 543 U.S. 146, 153-54 (2004). He points to Section 552.006 of the Transportation Code, a fine-only Class C misdemeanor which carries no jail time as punishment. *See* Tex. Transp. Code § 542.301 (setting a violation as a Class C misdemeanor); Tex. Penal Code § 12.23 (setting the punishment for a Class C offense at a fine not to exceed $500). Defendant marshals a number of cases for the idea that "Texas courts routinely find probable cause for arrest for walking on the incorrect side of the street." Dkt. 50 at 30.

Whether arrests for this offense are actually as "routine" as Defendant claims,[44] these cases still recognize that probable cause requires a showing of "specific facts within the presence or view of an officer for him to reasonably conclude therefrom that an offense is being committed in his presence or within his view." *McBride v. State*, 359 S.W.3d 683, 692 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (quoting *Drago v. State*, 553 S.W.2d 375, 377 (Tex. Crim. App. 1977)).

Unlike the officers in each of the four cases Defendant cites, Sgt. Rudloff does not say—and cannot say—that he personally observed Plaintiff walking on the shoulder on the wrong side of the highway. Even though he apparently recalls seeing Plaintiff on the highway, he offers no particularized testimony to establish where he saw him, whether he saw him on the shoulder, or what direction he was facing.

---

[44] And when made without "adequate cause," run the risk of being used "to target pedestrians in an arbitrary manner." *Utah v. Strieff*, 579 U.S. 232, 252 (2016) (Sotomayor, J., dissenting).

To make up for this lack of particularized testimony, he again blurs the line between what *he knew* at the time of Plaintiff's arrest, and what Plaintiff has revealed to him long after the fact. *Club Retro*, 568 F.3d at 204 ("[P]ost-hoc justifications based on facts later learned cannot support an earlier arrest."). Despite pointing to Plaintiff's own testimony about his position on the highway, Defendant again and again stops short of saying *he* possessed the requisite particularized knowledge needed to validate Plaintiff's arrest for that offense. At best, Defendant says that his team's "rightward sweep" across the highway "places Plaintiff—whether he had been on the obstructed highway or not—on the illegal *side* of the highway[.]" Dkt. 50 at 29 (emphasis added).

Equally problematic to Defendant's argument is that Section 552.006 only requires that a pedestrian walk on "the left side of the roadway" or "the shoulder of the highway facing oncoming traffic" *if possible*. To support a finding of probable cause then, Defendant has to point to facts showing not just that Plaintiff was on the wrong side of the roadway, but at a minimum that the proper side of the roadway was "accessible." *McBride*, 359 S.W.3d at 693. He has not. Defendant—who testifies he crossed the interstate with his team from west to east to reach the protesters on I-35's northbound lanes—would have known that from Plaintiff's position, it would have been impossible to cross the roadway to the allegedly proper side. That is because it would have required Plaintiff to cross lanes of traffic in violation of the immediately preceding provision of the same code Defendant accuses Plaintiff of violating. *See* Tex. Transp. Code § 552.005 (requiring a pedestrian to "yield the right-of-way to a vehicle on the highway if crossing a roadway" at a place without a crosswalk, pedestrian tunnel, or overhead crossing).[45]

---

[45] The absurdity of Defendant's argument can also be punctuated by highlighting conduct that would have been entirely legal while on the shoulder. Plaintiff could have, for example:

1. Stood on the shoulder, or run along it, *see* Tex. Transp. Code § 552.006 (only limiting walking);

2. Faced oncoming traffic and walked down the shoulder backwards, *id.* (requiring pedestrian to face oncoming traffic); Pl. App'x 27 (picture taken by Plaintiff while facing oncoming traffic);

For all Defendant's claims that Plaintiff was "illegally on the highway's shoulder[,]" Dkt. 50 at 26, 27, 28, Defendant has not introduced sufficient evidence particularized to Plaintiff to establish Defendant had anywhere close to the level of knowledge required to believe Plaintiff committed any of the crimes Defendant accuses him of. Sgt. Rudloff says he saw Plaintiff on the highway, but can't say more than that; he says hundreds of protesters were rioting on the highway, but documentary evidence contradicts that claim; and he says both of these (controverted) facts, taken together, represent the totality of the circumstances that permitted him to arrest Plaintiff and anyone else in the grassy area. But at a minimum, Plaintiff has introduced prima facie evidence showing Defendant lacked probable cause to arrest him, and that other record evidence Defendant relies upon is either false, misleading, or conclusory. Against that backdrop, Defendant has not shown he is entitled to summary judgment on his claim of qualified immunity on Plaintiff's Fourth Amendment false arrest claim. His motion on that claim should be denied.

> v. Undisputed Evidence Shows that Defendant Arrested Plaintiff in Retaliation for Exercising his First Amendment Right to Record the Police in the Exercise of their Official Duties.

Nor has Defendant shown he is entitled to summary judgment on Plaintiff's First Amendment retaliation claim. Wrongly assuming his fact-riddled probable cause argument will carry the day, Defendant instead focuses his attention on *Nieves v. Bartlett*, in which the Supreme Court pronounced a narrow exception to the rule that First Amendment retaliation claims cannot proceed when probable cause to arrest has otherwise been established. *See Nieves v. Bartlett*, 139 S. Ct. 1715 (2019); Dkt. 50 at 31-37. For the following reasons, Plaintiff's retaliation claim should move forward.

> 1. *Defendant Has Only Sought Summary Judgment on the Nieves Exception.*

---

3. Photographed the protest while riding a bike, *see* Tex. Transp. Code § 554.058(c)(3).

If Plaintiff has met his burden to show at least a genuine dispute of material fact over whether probable cause existed for Defendant to arrest him, then Plaintiff is entitled to proceed with his First Amendment retaliation claim for two reasons. *First*, Defendant has failed to address the substance of Plaintiff's retaliation claim if probable cause *did not* exist to arrest him. He has thus failed to adequately brief the issue and accordingly waived it. *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 255 (5th Cir. 2008) ("A party 'waives an issue if he fails to adequately brief it.'" (quoting *Castro v. McCord*, No. 05-21034, 2007 WL 4467566, at *1 (5th Cir. Dec. 18, 2007))); *Melear v. Spears*, 862 F.2d 1177, 1184 (5th Cir. 1989) (when a defendant fails to move for summary judgment "the trier of fact must determine the objective legal reasonableness of an officer's conduct by construing the facts in dispute").

*Second*, Plaintiff's evidence shows that Sgt. Rudloff's conduct objectively demonstrated an intent to retaliate against Plaintiff for photographing Defendant arresting and using force against protesters on May 30, 2020. *See Keenan v. Tejeda*, 290 F.3d 252, 261-62 (5th Cir. 2002). Plaintiff looked on and photographed as Defendant and his team moved in to arrest protesters they encountered on the grassy area adjacent to I-35.[46] Within moments of arriving, Defendant moved in to arrest a Black man who Plaintiff had just photographed aiding an injured woman.[47] To execute this arrest, Defendant approached from the man's right side, immediately laid hands on him while the man was speaking with other officers, and brought him to the ground with the assistance of another officer. As Defendant maneuvered around the scene, his attention was drawn by the verbal protests of a woman behind him—Jantzen Verastique—who approached to object to the arrest of

---

[46] Pl. App'x 5-8 (¶¶ 27-43); 31-83; 114-15 (¶¶ 10-13); 121-135.

[47] *Id.* 29-61.

the Black man Defendant and another officer had just forcibly restrained.[48] Rudloff shot Verastique three times in the chest at point-blank range with his pepperball gun, despite her not posing any apparent threat to Rudloff and the other officers on scene.[49] Rudloff then turned his attention to another protester, Parker Nevills, whom another officer had already come into contact with. According to Defendant, Nevills did not respond to his command to get on the ground fast enough. Def. App'x 2. This led Rudloff to knee him in the stomach, and then work with two other officers to bring Nevills to the ground and restrain him as well. *Id.*[50]

Plaintiff documented all this as it happened.[51] Standing from a safe vantagepoint approximately ten feet away, he followed Rudloff and the other officers with his camera as he watched them arrest the protesters around him indiscriminately—apparently resolved to arrest first and ask questions later.[52] The whole time, Plaintiff was visible to Rudloff as Plaintiff exercised his First Amendment right to record the police in the exercise of their official duties.[53] He consciously avoided interfering with police or getting too close to be confused for a protester.[54] But these efforts were for naught.

When Rudloff finished assisting the other officers in restraining Nevills, he stood up and walked straight toward Plaintiff, telling him he was going to jail, too.[55] Plaintiff pled with Rudloff

---

[48] *Id.* 119-25; *see also id.* 114 (¶ 11); 158, 159.

[49] *Id.* 7 (¶¶ 35-36); 65-69. And despite the fact that Rudloff and his team were at that moment purportedly the targets of projectiles allegedly thrown by other protesters nearby, according to the testimony of Cpl. Barrett and Cpl. Pillar. Def. App'x 4, 8.

[50] *Id.* 157 (00:31 to 01:05).

[51] *Id.* 5-8 (¶¶ 27-43); 31-83; 114-15 (¶¶ 10-13); 121-135.

[52] *Id.* 6-7 (¶¶ 30-32, 41).

[53] *Id.* 7 (¶ 41); 121-35. *See Turner v. Lt. Driver*, 848 F.3d 678 (5th Cir. 2017).

[54] *Id.* 3, 7 (¶¶ 13, 41).

[55] *Id.* 8 (¶ 44); 115 (¶¶ 14-17); 147-55; *see also id.* 157 (at 1:01-1:04) (Rudloff off-camera saying "you're also under arrest get on the ground").

that he was a member of the press and attempted to show Rudloff his press ID. "Yeah, yeah, press, press, you're going to jail," Defendant answered.[56] Defendant then grabbed Plaintiff by the shirt, pulled him towards the other protesters he had just arrested, and threw him to the ground. Only then did Cpl. Pillar move in to handcuff Plaintiff and search him.[57] As Plaintiff was arrested, another journalist, Skye Seipp, watched from 20-30 feet away and photographed Plaintiff's arrest. He recalls that, after Defendant completed Plaintiff's arrest, Rudloff turned towards him and another nearby journalist, Tom Fox, and threatened them with arrest, too. This caused them to stop photographing and immediately leave the scene for a safer area.[58]

This sequence of events is prima facie evidence that Plaintiff would not have been arrested but for the fact that he had his camera trained on Sgt. Rudloff as he swiftly and indiscriminately arrested and deployed force against at least four protesters. Plaintiff could be seen moving around the scene photographing the arrests and Rudloff's use of force as they happened. He kept a safe distance so as not to interfere with police or to be confused as a member of the protest group. Only after Sgt. Rudloff completed his other arrests did he single out Plaintiff, who was the closest of the journalists nearby, after he had just photographed Defendant shoot one protester without clear provocation and knee another. Plaintiff's pleas that he was a member of the press were verbally acknowledged and clearly disregarded by Sgt. Rudloff—as were the other clear indicators he was a member of the press, his prominently displayed press badge and the two large, professional-grade cameras he carried.

---

[56] *Id.* 8 (¶¶ 45-46).

[57] *Id.* 8 (¶ 48); 89.

[58] *See* Pl. App'x 115 (¶¶ 14-17).

The fact that Plaintiff was arrested last of all the people Rudloff and his team arrested bears emphasis. Plaintiff did not command the attention of *any* officer on the scene until after he had documented the lightning-quick speed with which Rudloff arrested and used force against several protesters. But the whole time, he was within Rudloff's view as Plaintiff's camera followed him around and captured his actions. By the time Rudloff turned on Plaintiff, there were no clear threats to Rudloff or others on the scene. Most protesters had run away, likely out of fear they could be arrested, too. Rudloff had the opportunity to pause, ask Plaintiff about his whereabouts, verify his media credentials, and determine next steps. No exigency in the moment required he continue to act as fast as he did. *See Evett*, 330 F.3d at 688-89 (lack of specific information paired with "unhurried" setting of the moment demonstrated unreasonableness of officer's arrest, underscored need to investigate further).[59]

But Defendant did none of those things. Instead, in response to his actions being captured on film, he arrested Plaintiff for exercising his right to record Defendant. That is an objectively fair conclusion based on Rudloff's actions, words, and conduct taken together. For that reason, and the fact that Defendant left the issue unbriefed, Defendant is not entitled to summary judgment on Plaintiff's retaliation claim.

       2. *Even if Defendant had Probable Cause to Arrest Plaintiff, the Nieves Exception Applies Here.*

Even if Defendant had probable cause to arrest Plaintiff, Plaintiff's retaliation claim should proceed because the testimony of Defendant's officers demonstrates that they witnessed, yet

---

[59] For the reasons described in Plaintiff's Motion for Partial Summary Judgment, Dkt. 46 at 27, Defendant's conduct would have also chilled a person of ordinary firmness, and did chill Plaintiff, from exercising his constitutional rights moving forward. *See* Pl. App'x 9-10 (¶¶ 53-60).

declined to arrest nearby protesters who were similarly situated to Plaintiff and who were purportedly hurling projectiles at the officers while Defendant executed Plaintiff's arrest.

In *Nieves v. Bartlett*, the Supreme Court confirmed that First Amendment retaliation claims generally do not lie where probable cause existed to arrest the person asserting retaliation. 139 S. Ct. at 1727. But the Court held that "a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so. In such cases, an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech.'" *Id.* (quoting *Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1953 (2018)). Thus, the Court concluded, "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*

In a recent case, the Fifth Circuit determined what kind of evidence was needed to properly invoke the exception. Taking a narrower view than other circuits to address the issue, the Court concluded that "objective evidence of otherwise similarly situated individuals who engaged in the same criminal conduct but were not arrested" requires "some comparative evidence." *Gonzalez v. Trevino*, 42 F.4th 487, 492-93 (5th Cir. 2022).

That comparative evidence is present here. As Plaintiff explained above, the crowd of protesters he documented was largely peaceful but for the subset of the group that obstructed the roadway. And even among that group, Plaintiff recalls that most did not engage in violent or riotous behavior, if any did at all. Nonetheless, Defendant asserts that Plaintiff was arrested because of his

40

presence on the highway,[60] amid a scene of riotous and violent conduct.[61] Even if that's true—Plaintiff still disagrees strongly—it is uncontroverted that Plaintiff's presence on the highway and in the grassy area was in furtherance of the exercise of his First Amendment right to document the historic scenes unfolding in front of him—a fact which would have triggered additional protections from arrest and prosecution under the very law Defendant accuses him and others of violating. *See* Tex. Penal Code 42.04(a), (c)(1), (c)(3) (requiring an order to disperse, and establishing a defense to prosecution if no order was given or a person promptly obeyed that order).[62]

Defendant nonetheless arrested him, while his officer declarants Barrett and Pillar testify that other protesters nearby who had also been on the highway and were now throwing projectiles at them—conduct that is clearly not protected speech—were not arrested and were allowed to leave the scene. Indeed, Cpl. Barrett explains that "[o]nce we were on the east side of I-35 on the grass, I was addressing a crowd that had been on the freeway that was using a wall as cover while throwing rocks, bottles, and other materials at us." It is then that "[a]nother group of individuals then came up from the freeway over the guardrails of I-35 towards us. This group included the photographer I later learned was Mr. Rusanowsky, whom I also saw coming from the freeway over the guardrails." Def. App'x 4; *see also id.* ("While this was happening, the crowd was still throwing

---

[60] Def. App'x 1 ("In addition to Mr. Rusanowsky and others, I specifically observed Mr. Nevills and the woman I later deployed my PepperBall launcher at on I-35 prior to our direct interaction."); *id.* at 4 ("This group included the photographer I later learned was Mr. Rusanowsky, whom I also saw coming from the freeway over the guardrails."); *id.* at 7 ("The small group we encountered on the grass appeared to be coming back to the highway. I recall seeing a man with two cameras within the group; at one point, he was in front of me on I-35.").

[61] Def. App'x 1 ("Many within the group began throwing rocks, shaking cars, glass bottles, full water bottles and other items at our group."); Def. App'x 4 ("Many within the group on the freeway began throwing rocks, glass bottles, full water bottles, and other items at our group."); Def. App'x 7 ("Many within the group on the freeway began throwing rocks, glass bottles, full water bottles, and other items at our group.").

[62] A fact dispute exists over whether such an order was actually given. *Compare* Def. App'x 1 ("People were told to disperse from the highway, but they did not."), Def. App'x 13 *with* Pl. App'x 4 (¶ 25), 114 (¶ 9) (a loud noise triggered the crowd to disperse).

materials at us and shouting obscenities."). Cpl. Pillar likewise remembers that, while he was on the scene, "the crowd was still throwing materials at us and shouting obscenities." Def. App'x 8.

In other words, Defendant and his team testify that they confronted two groups of people, both similarly situated because they had allegedly been on the highway exercising their constitutional rights. One group, who apparently started throwing projectiles at Defendant and his team, was left untouched and was free to go. Another group, which apparently includes Plaintiff according to these three officers, was arrested for their alleged mere presence on the highway while protesting and, in Plaintiff's case, recording the protests. Because Plaintiff's constitutional conduct in recording the protests and his positioning off the freeway when he was arrested directly implicated the validity of his arrest—Tex. Penal Code 42.04(a), (c)(1), (c)(3)—his arrest is one where police would have typically "exercise[d] their discretion not to do so." *Nieves*, 139 S. Ct. at 1727. The fact that Defendant then singled him out for arrest after Plaintiff photographed Rudloff's egregious conduct, coupled with the fact that other people who had been on the freeway and were actively attacking police with projectiles were not, is comparative evidence that Plaintiff has stated a valid First Amendment retaliation claim. On that basis, Defendant's motion for summary judgment as to this claim should be denied.

### b. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FOURTH AMENDMENT MALICIOUS PROSECUTION CLAIM.

In *Thompson v. Clark*, the Supreme Court clarified that its precedents recognize a Fourth Amendment claim for malicious prosecution under Section 1983. 142 S. Ct. 1332, 1337 (2022). Since *Thompson*, the Fifth Circuit has reinstated its holding in *Gordy v. Burns*, 294 F.3d 722 (5th Cir. 2002), in which it determined that to assert a valid Fourth Amendment claim for malicious prosecution, a plaintiff must meet the state law elements of the malicious prosecution tort, "in addition to the threshold element of an unlawful Fourth Amendment seizure." *Armstrong v. Ashley*,

42

60 F.4th 262, 279 (5th Cir. 2023). Thus, to proceed with his Fourth Amendment malicious prosecution claim, Plaintiff must show: "(1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) malice; and (6) damages." *Id.*; *see Thompson*, 142 S. Ct. at 1335 (holding that a favorable termination of a criminal prosecution requires that the prosecution "ended without a conviction").

For the reasons explained in Plaintiff's Motion for Partial Summary Judgment, Plaintiff is entitled to proceed with his malicious prosecution claim. Dkt. 46 at 30-32. Defendant attacks the claim on two fronts. First, he reiterates that, because he had probable cause to arrest Plaintiff, that "extinguishes any claims for malicious prosecution." Dkt. 50 at 38. As discussed above, Plaintiff has shown that Rudloff and his team lacked probable cause to arrest him, or at a minimum that a genuine dispute of material fact exists as to whether probable cause existed at the time of Plaintiff's arrest.

Second, Defendant doubles down on his factually and legally incorrect assertion that Defendant was not Plaintiff's arresting officer. He deflects blame instead onto Chief Thomas Castro, who he says ordered the arrests by telling officers to "round those folks up"; Cpl. Pillar, who he falsely says was the first person to make contact with Plaintiff and actually arrest him; and Officer Hoffman, who he says filed the (false) arrest affidavit which resulted in a probable cause finding from a judge. Dkt. 50 at 38-39.

Sgt. Rudloff is the proper Defendant. He directly caused the commencement of the criminal legal proceeding against Plaintiff by arresting him without probable cause; and but for Sgt. Rudloff arresting Plaintiff, Rusanowsky would not have been brought before a magistrate judge by Officer

43

Hoffman—who stated that he was under orders to transport Plaintiff and fill out his arrest report, and who obtained a warrant to detain Plaintiff by filing an arrest affidavit that was itself false.[63] On these facts, Sgt. Rudloff can properly be held liable for malicious prosecution. *See Warner Bros. Ent., Inc. v. Jones*, 538 S.W.3d 781, 815 (Tex. App.—Austin 2017) (a criminal prosecution commences when "a person is arrested or a warrant for his arrest (or some other form of process) is issued"), *aff'd*, 611 S.W.3d 1 (Tex. 2020); *see also* Restatement (Second) of Torts § 654(2) & cmt. e (1977).

Chief Castro is not the proper defendant because, even if he issued a general order to Defendant and his team to "round those folks up," he did not commence the criminal proceeding against Plaintiff because he did not personally arrest Plaintiff—Rudloff did. For that same reason, Pillar is not the proper defendant because Rudloff, not Pillar, initiated Plaintiff's arrest. Finally, Hoffman's own involvement in filing a false affidavit of arrest does not negate Plaintiff's ability to sue Rudloff for malicious prosecution, because Rudloff, as the arresting officer, caused Hoffman to transport Plaintiff to jail and, acting under orders, fill out Plaintiff's arrest report. Defendant is therefore not entitled to summary judgment on Plaintiff's malicious prosecution claim either.

### c. DEFENDANT VIOLATED CLEARLY ESTABLISHED LAW WHEN HE ARRESTED AND RETALIATED AGAINST PLAINTIFF.

Lastly, at the time of Plaintiff's arrest, his Fourth Amendment right to be free from arrest and prosecution without probable cause, and his First Amendment right to record the police in the public exercise of their official duties, were both clearly established. *See Davidson*, 848 F.3d at 393-94 (citing *Club Retro*, 568 F.3d at 206); *Turner v. Lt. Driver*, 848 F.3d 678 (5th Cir. 2017); *see also Keenan*, 290 F.3d at 262 ("If no reasonable police officer could have believed that

---

[63] *See* Pl. App'x 8 (¶¶ 44-48), 161; 147-155; Def. App'x 13; Pl. Resp. App'x 3-4.

probable cause existed for the law enforcement actions … against the plaintiffs, then their retaliation violated clearly established law of this circuit."). *See* Dkt. 46 at 25, 29-30.

## VI.   CONCLUSION

On May 30, 2020, Sgt. Rudloff arrested Plaintiff without probable cause and in retaliation for exercising his First Amendment right to record Rudloff in the public exercise of his official duties. In seeking immunity from Plaintiff's claims, Sgt. Rudloff's motion is filled with factual discrepancies, inaccuracies, and outright falsehoods. Rather than show his entitlement to qualified immunity, Rudloff's motion shows precisely why Plaintiff's claims against him should proceed. Defendant's motion for summary judgment should be denied.

Dated: June 5, 2023

David W. Henderson
Texas State Bar No. 24032292
dhenderson@equalrights.law
J. Sebastian Van Coeverden
Texas State Bar No. 24128101
svancoevorden@equalrights.law
**ELLWANGER LAW LLLP**
400 S. Zang Blvd. Ste. 600
Dallas, TX 75208
Telephone: (469) 998-6775
Facsimile: (469) 998-6775

Respectfully Submitted,

*/s/ Thomas S. Leatherbury*
Thomas S. Leatherbury
Texas State Bar No. 12095275
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 N. Akard Street
Dallas, Texas 75201
tom@tsleatherburylaw.com
Telephone: (214) 213-5004

*/s/ Peter B. Steffensen*
Peter B. Steffensen
Texas State Bar No. 24106464
psteffensen@smu.edu
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX 75275
Telephone: (214) 768-4077
Facsimile: (214) 768-1611

**Counsel for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Peter B. Steffensen*
Peter B. Steffensen