IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| CHRISTOPHER RUSANOWSKY,<br><br>　　　　Plaintiff,<br><br>v.<br><br>THE CITY OF DALLAS and SGT. ROGER A. RUDLOFF, individually and in his official capacity as a Dallas Police Department Officer,<br><br>　　　　Defendants. | Civil Action No. 3:22-CV-01132-K |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant City of Dallas's Motion to Dismiss Plaintiff's Complaint, and Brief in Support (the "Motion" or the "Motion to Dismiss"), Doc. No. 15, Plaintiff's Response to Defendant City of Dallas's Motion to Dismiss (the "Response"), Doc. No. 18, and Defendant City of Dallas's Reply Brief in Support of Its Motion to Dismiss Plaintiff's Complaint (the "Reply"), Doc. No. 22. Having carefully considered the Motion, the Response, the Reply, the associated briefs, Plaintiff's Complaint, Doc. No. 1, and the applicable law, the Court **GRANTS in part and DENIES in part** the Motion.

I.   Background

This factual recitation is drawn from Plaintiff's Complaint, Doc. No. 1. The allegations are summarized, identifying the points most relevant for this Memorandum

1

Opinion and Order. In analyzing a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in favor of the plaintiff. *See Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007) (per curiam).

Plaintiff Christopher Rusanowsky ("Rusanowsky" or "Plaintiff") is a freelance photojournalist. Doc. No. 1 ¶ 15. On May 30, 2020, Rusanowsky was assigned to cover the Dallas, Texas protest organized in response to the death of George Floyd on May 25, 2020. *Id.* ¶¶ 17-18. After he arrived in downtown Dallas, Plaintiff began to work near a group of other journalists also covering the protest. *Id.* ¶ 19. At some point, the protesters began moving onto a highway. *Id.* ¶ 20. Plaintiff documented this from a grassy shoulder adjacent to a highway off-ramp. *Id.* A small group of protesters also moved onto that grassy shoulder. *Id.* Dallas Police Department ("DPD") officers then began to arrest some of those protesters. *Id.* ¶ 21. One of those officers was Sergeant Roger A. Rudloff ("Sgt. Rudloff"). *Id.*

From the grassy shoulder, Plaintiff witnessed Sgt. Rudloff approach protester Jantzen Verastique. *Id.* Plaintiff captured the moment Sgt. Rudloff shot Verastique in the chest with a pepper ball at close range. *Id.* Soon thereafter, Parker Nevills, "another unarmed protester," approached Sgt. Rudloff and some of his fellow-officers. *Id.* ¶ 23. Sgt. Rudloff grabbed Nevills by the hair and, while his hands were behind his back, kneed Nevills in the stomach. *Id.* ¶¶ 2, 23, 52. Plaintiff also captured some of this use of force against Nevills. *Id.* ¶ 23. Sgt. Rudloff noticed. *Id.* ¶ 24. According to Plaintiff,

2

"Recognizing that his use of force against two unarmed protesters had been captured by Rusanowsky, Defendant Sgt. Rudloff . . . turned in the direction of Rusanowsky and shouted 'you're next!'" *Id.*

Plaintiff had his laminated press credentials with him, wore a press baseball cap, and carried professional photography gear. *Id.* ¶ 25. As Sgt. Rudloff approached him, Plaintiff identified himself as a member of the press. *Id.* ¶ 26. Sgt. Rudloff responded, "Yeah, yeah, press, press. You're going to jail." *Id.* ¶ 27. Sgt. Rudloff—the supervising officer at the scene—then ordered another officer to arrest Plaintiff. *Id.* ¶ 28. Plaintiff alleges that he was "warned that his cameras, containing the photographic evidence of Defendant Sgt. Rudloff's use of force against Verastique and Nevills, would be destroyed if the officers felt that they were a threat." *Id.* Plaintiff claims that no officer on the grassy shoulder warned him that his photography was impeding their work, and at no time did he resist, obstruct, or oppose the officers in the execution of their duties. *Id.* ¶¶ 35, 36. Plaintiff believes that he was the only person distinguishable as a journalist to be arrested on the grassy shoulder. *Id.* ¶ 41. According to Plaintiff,

> What differentiated [Plaintiff] from these other journalists was not any obstruction of police activity, not any obstruction of traffic or of a highway, and not participation in a riot or the protest he was assigned to cover. Rather, what was different is that [Plaintiff] was identified by Defendant Sgt. Rudloff capturing the sergeant's own excessive use of force against two unarmed protesters, activity clearly protected by the First Amendment.

*Id.* ¶ 44.

Plaintiff was later moved into a "crowded van" where he waited for several hours. *Id.* ¶¶ 30, 47. Plaintiff claims that "DPD used no precautions to protect detainees from transmission of COVID-19, recklessly endangering those being held." *Id.* ¶ 47. No officer informed Plaintiff of his charges despite his repeated questions. *Id.* ¶¶ 30, 31. Eventually, Plaintiff was transported to the Lew Sterrett Justice Center where he was processed. *Id.* ¶¶ 32, 48. It was not until his arraignment that Plaintiff learned that he was being charged with "obstruction of a highway in violation of the law." *Id.* ¶¶ 32, 37. The DPD Incident Report describing Plaintiff's arrest made no mention of this, however, and instead listed Plaintiff's offense as "'RIOT PARTICIPATION . . . 42.02A.'" *Id.* ¶ 37. Plaintiff's charges were dropped months later. *Id.* ¶ 49.

The protests were widely covered by the media. *Id.* ¶ 51. The Dallas Morning News ("DMN") licensed Plaintiff's photograph of Sgt. Rudloff's interaction with Jantzen Verastique for the front page of its Sunday, August 9, 2020, newspaper. *Id.* ¶ 45. The photograph was included above the headline "A blast at close range: Photo shows cop firing pepper-ball gun at a peaceful protester." *Id.* (citing Miles Moffeit, Cassandra Jaramillo, & Dianne Solis, *'I felt like my chest was on fire'*: Photo shows Dallas police officer shooting protester with pepper-ball gun, DALLAS MORNING NEWS (Aug. 9, 2020), https://www.dallasnews.com/news/investigations/2020/08/09/i-felt-like-my-chest-was-on-fire-photo-shows-cop-blasting-a-peacefu-protester-with-a-pepper-ball-gun-at-close-range/.). About one year later, the DMN published an article about Sgt. Rudloff's history as an officer with the DPD. *Id.* ¶ 54 (citing Miles Moffeit,

4

Cassandra Jaramillo & Madi Alexander, *Flashlight beatings, chokings and threats: Dallas officer faced multiple accusations of brutality*, DALLAS MORNING NEWS (Sep. 16, 2021), https://www.dallasnews.com/news/investigations/2021/09/16/flashlight-beatings-chokings-and-threats-dallas-officer-faced-multiple-allegations-brutality/.).

From that article, Plaintiff alleges the following:

> 55. In July 1998, Defendant Sgt. Rudloff allegedly threatened to beat a Black man with a flashlight. According to the sworn statement the man gave to DPD Internal Affairs, Defendant Sgt. Rudloff told him that he used the flashlight to "beat n-----s in the head."
>
> 56. In October 1998, another complaint alleged that Defendant Sgt. Rudloff choked a driver after stopping her for failure to use a turn signal.
>
> 57. Between 1998 and 2000, another eight complaints were filed against Defendant Sgt. Rudloff for alleged physical and verbal abuse.
>
> 58. In January 1999, after responding to a disturbance call involving a man with a gun, Defendant Sgt. Rudloff handcuffed an unarmed Black man, allegedly striking him with the palm of his hand and choking him.
>
> 59. Two separate complaints and accompanying federal lawsuits were filed against Defendant Sgt. Rudloff in 1999, alleging two separate instances in which Defendant assaulted Black men with his flashlight.
>
> 60. In November 1999, Defendant Sgt. Rudloff beat Keith Burkins so severely with a flashlight that Burkins required seven staples in his head. A senior corporal who witnessed the assault reported Defendant Sgt. Rudloff to a supervisor, but Defendant Sgt. Rudloff denied any wrongdoing and claimed Burkins hit his head on a sidewalk. DPD investigated the allegations for nine months, during which time Defendant Sgt. Rudloff was allowed to stay on patrol, and although investigators concluded that Defendant was "untruthful" both in an account given to his supervisor and in his written statement, the sum total of DPD's disciplinary action against Defendant was to place him on a ten-day unpaid suspension.

> 61. In 2002, Defendant Sgt. Rudloff was accused of racial profiling when he frisked a Black man waiting at a bus stop, allegedly telling the man that he was being searched because Defendant was looking for a Black suspect and he was Black.
>
> 62. In 2005, Defendant Sgt. Rudloff were sued in their individual capacities for assault and battery of and use of excessive force against Bret Poat. Poat, the plaintiff, alleged that two officers who transported him from the scene of his arrest (one of whom the City identified as Defendant Sgt. Rudloff) assaulted him by repeatedly striking his face and battering him with a nightstick. Two weeks before the case was scheduled for trial on the assault and battery and excessive force claims, it was settled.
>
> 63. In 2009, after his promotion to sergeant, Defendant was yet again accused of excessive force when he and other officers allegedly slammed a man's head into the ground while arresting him for public intoxication.
>
> 64. In 2012, Defendant Sgt. Rudloff and two other officers fatally shot a carjacking suspect, firing about thirty rounds into his car. Defendant Sgt. Rudloff was "admonished" by a supervisor after the shooting for violating DPD policy by using a firearm for which he was unqualified.
>
> 65. And in 2018, Defendant Sgt. Rudloff was "rebuked" for "making a lewd comment about a dead woman in a conversation over a police radio with other officers."

*Id.* ¶¶ 55-65. Citing the article, Plaintiff also alleges that the DPD's ten-day suspension for the incident involving Burkins "is the most significant disciplinary consequence the DPD has imposed on Defendant." *Id.* ¶ 66; *see* ¶ 67.

Plaintiff seeks relief against Sgt. Rudloff and the City of Dallas (the "City" or "Defendant") under 42 U.S.C. § 1983. *Id.* ¶¶ 86-118. The instant Motion to Dismiss involves only Plaintiff's municipal liability claims against the City. Doc. No. 15.

6

## II.     Rule 12(b)(6) Standard

In considering a Rule 12(b)(6) motion, a court must determine whether the plaintiff has sufficiently stated a claim upon which relief may be granted. A well-pleaded complaint must allege facts upon which the claims are based and not merely recite the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The facts must be sufficiently alleged such that the "claim has facial plausibility" and is not merely "possible". *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff pleads a claim with facial plausibility when the "factual content . . . allows the court to draw the reasonable inference that the defendant is liable." *Id.* In other words, the alleged facts must nudge the plaintiff's claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The Court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to the plaintiff." *Stokes*, 498 F.3d at 484. The Court does not, however, "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (internal quotation marks omitted)). The Court must generally determine a motion to dismiss for failure to state a claim based solely on the pleadings, including any attachments thereto. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

**III.     Analysis**

Section 1 of the Civil Rights Act of 1871 (also known as the Ku Klux Klan Act of 1871), is codified, as amended, at 42 U.S.C. § 1983; § 1983 provides in relevant part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

*See Jamison v. McClendon*, 476 F. Supp. 3d 386, 400 (S.D. Miss. 2020). A municipality may be liable under § 1983 if the execution of one of its customs or policies deprives a person of their constitutionally protected rights. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978); *see Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010). The unconstitutional conduct the plaintiff complains of "must be directly attributable to the municipality through some sort of official action or imprimatur[.]" *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) ("[T]here must be both municipal culpability and causation."). A municipality's liability cannot rest on the theory of *respondeat superior* as "isolated unconstitutional actions by municipal employees will almost never trigger liability." *Id.* "[U]nder § 1983, local governments are responsible only for their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotations omitted). Accordingly, "it is far more difficult for [a] plaintiff to establish

municipal liability . . . than to establish individual liability." *Ayers v. City of Holly Springs*, Civ. Action No. 3:05-CV-75, 2006 WL 2943295, at *4 (N.D. Miss. Oct. 13, 2006).

To successfully establish municipal liability under § 1983, "[the] plaintiff must identify: '(1) an official policy (or custom), of which, (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom.'" *Valle*, 613 F.3d at 541-42 (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)); *see Monell*, 436 U.S. at 694. For the first prong, "A policy or custom can be either (1) a policy statement or rule that is officially promulgated by the county's lawmaking officers or a delegated official; or (2) a persistent, widespread practice of county officials or employees, which is so common and well settled as to constitute a custom that fairly represents county policy." *Flanagan v. City of Dallas*, 48 F. Supp. 3d 941, 949 (N.D. Tex. 2014) (Toliver, MJ.) (citing *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir. 1984)).

To meet the second prong, Plaintiff must sufficiently plead the identity of a policymaker with "final policymaking authority." *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). "City policymakers not only govern conduct; they decide the goals for a particular city function and devise the means of achieving those goals. Policymakers act in the place of the governing body in the area of their responsibility; they are not supervised except as to the totality of their performance." *Bennett*, 735 F.2d at 769. The Court's "analysis must also take into account the difference between final

9

decisionmaking authority and final policymaking authority, a distinction that this circuit recognized as fundamental in *Jett v. Dallas Indep. Sch. Dist.,* 7 F.3d 1241, 1247 (5th Cir. 1993). . . . [D]iscretion to exercise a particular function does not necessarily entail final policymaking authority over that function." *Bolton v. City of Dallas*, 541 F.3d 545, 548-49 (5th Cir. 2008) (first citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); and then citing *Praprotnik*, 485 U.S. 112). Here, the parties do not seem to dispute that the Dallas City Council is the final policymaker for the DPD. *See* Doc. No. 1 ¶¶ 70-71; Doc. No. 15 at 23-25; *see also Groden v. City of Dallas*, 826 F.3d 280, 285-86 (5th Cir. 2016).

To satisfy the third prong, the plaintiff must establish direct causation between the policy and the constitutional violation. *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (citing *Piotrowski*, 237 F.3d at 580). Here, the constitutional violations alleged by Plaintiff are linked; according to Plaintiff, Sgt. Rudloff illegally arrested him (in violation of the Fourth Amendment) in retaliation for the lawful exercise of his First Amendment right to photograph policy activity in a public place. *See* Doc. No. 1 ¶¶ 1, 3, 5, 13, 34, 44, 87-92, 97-101, 105-09. Plaintiff does not appear to specifically allege a Fourteenth Amendment violation.

Plaintiff seemingly alleges two policies or customs of the City that caused the allegedly retaliatory and unconstitutional arrest. First, a "failure to train officers on interactions with media personnel, interactions with protesters, rules of engagement and mass arrest procedures . . . ." *Id.* ¶ 46; *see id.* ¶¶ 29, 75-80, 83-84, 113, 115. And

10

second, a failure to supervise or discipline Sgt. Rudloff—"an officer repeatedly accused of constitutional violations and sued by multiple citizens in civil rights actions." *Id.* ¶ 114; *see id.* ¶¶ 13, 72-74, 113; *see also* Doc. No. 18 at 28-29. These "failures to act" (*i.e.*, failures to train, supervise, or discipline) may, under certain circumstances, constitute policies for purposes of municipal liability under § 1983. *See Forster v. Bexar Cnty.*, No. 5:21-CV-00765-JKP-RBF, 2022 WL 2820857, at *19 (W.D. Tex. July 19, 2022) (noting that the Fifth Circuit applies the same failure to train principles from *City of Canton v. Harris*, 489 U.S. 378, 385-86 (1989), to other failures to act). "[T]he Fifth Circuit does not differentiate between failure to train and failure to supervise claims when discussing such claims." *Id.* (first citing *Parker v. Blackwell*, 23 F.4th 517, 525 (5th Cir. 2022); and then citing *Culbertson v. Lykos*, 790 F.3d 608, 625 (5th Cir. 2015)). Just like with regular municipal liability claims, all failure to act claims "involve the same basic elements: inadequacy, deliberate indifference, and causation." *Snow v. City of El Paso*, 501 F. Supp. 2d 826, 833 n.5 (W.D. Tex. 2006).

### A. *Failure to Train Officers of the DPD*

A failure to train may fairly be said to represent a policy for purposes of municipal liability under § 1983, but only when, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390; *see Valle*, 613 F.3d at 547. A municipality's

11

"culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. To successfully plead a claim under a failure to train theory, a plaintiff must plausibly allege that: "(1) the municipality's training procedures were inadequate, (2) the municipality was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused the violations in question." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010) (citing *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009)). Here, Defendant contends that Plaintiff fails to allege facts from which the Court can reasonably infer that the training procedures were inadequate, that the City was deliberately indifferent in adopting the training policy, and that the inadequate training policy directly caused Plaintiff's injuries. *See* Doc. No. 15 at 16, 19, 28. The Court is doubtful that Plaintiff has adequately alleged any of the three elements, though it concludes that Plaintiff fails to plausibly plead at least the second prong of his failure to train theory—deliberate indifference. Thus, the Court need not specifically address the other two prongs. *See Zarnow*, 614 F.3d at 171.

Deliberate indifference is a rigorous standard, for which "[a] showing of simple or even heightened negligence will not suffice." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997). Instead, deliberate indifference requires proof that the infringement of the plaintiff's constitutional rights was "an 'obvious' and 'highly predictable' consequence of the failure to train." *Parker*, 23 F.4th at 525 (quoting *Culbertson*, 790 F.3d at 625); *see Valle*, 613 F.3d at 542. "A less stringent standard of

fault for a failure-to-train claim 'would result in *de facto respondeat superior* liability on municipalities . . . .'" *Connick*, 563 U.S. at 62 (quoting *City of Canton*, 489 U.S. at 392).

A plaintiff may establish deliberate indifference in one of two ways. *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018). The first way—the "proof-by-pattern" method—requires that a plaintiff show "[a] *pattern* of *similar* constitutional violations by untrained employees . . . ." *Connick*, 563 U.S. at 62 (emphasis added). The proof-by-pattern method is "ordinarily necessary," *Bryan Cnty.*, 520 U.S. at 409, "because a pattern provides notice to the municipality and its policymakers of a need to remedy a deficient training program or to address deficient supervision or discipline." *Forster*, 2022 WL 2820857, at *21 (citing *Connick*, 563 U.S. at 62). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

Without evidence of a pattern, a plaintiff may be able to establish deliberate indifference through the "single-incident exception," which requires a showing that "the risk of constitutional violations was or should have been an 'obvious' or 'highly predictable consequence' of the alleged training inadequacy." *Littell*, 894 F.3d at 624 (quoting *Bryan Cnty.*, 520 U.S. at 409). The single-incident exception "is inherently 'a narrow one, and one that [the Fifth Circuit has] been reluctant to expand.'" *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 385 (5th Cir. 2005)

(quoting *Burge v. St. Tammany Par.*, 336 F.3d 363, 377 (5th Cir. 2003)). The Supreme Court famously hypothesized this exception in *City of Canton*:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force ... can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

489 U.S. at 390 n.10. "A need for training is so obvious when the risk occurs 'in recurrent situations that a particular employee is certain to face.'" *Vess v. City of Dallas* (*Vess I*), No. 3:21-CV-01764-D, 2022 WL 625080, at *8 (N.D. Tex. Mar. 3, 2022) (Fitzwater, J.) (quoting *City of Canton*, 489 U.S. at 396). Significantly, "there is a difference between a *complete failure to train*[] . . . and a failure to train in one limited area." *Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018). And the Fifth Circuit generally reserves the single-incident exception for cases when the employee "was provided no training whatsoever." *Id.*

Plaintiff invokes Sgt. Ruldoff's alleged "pattern of disregarding the fundamental constitutional rights of the people he interacted with" to establish a pattern evincing the City's deliberate indifference to the need to train the DPD in interactions with media personnel, interactions with protesters, rules of engagement, and mass arrest procedures. Doc. No. 18 at 21; *see* Doc. No. 1 ¶ 46. The Court is skeptical that the sordid past of a single officer within a police force as large as the DPD can establish a sufficiently obvious pattern that would put the City on notice of a general training deficiency. But even if it could, Sgt. Rudloff's prior constitutional violations (assuming

14

that they are true) are not sufficiently similar to the ones alleged in this case for the City to have plausibly been on notice of the general need to train its officers on interactions with protesters and the media. As noted above, to plausibly plead a pattern evincing deliberate indifference, a plaintiff must allege facts that demonstrate a recurring pattern of *similar* constitutional violations committed by untrained employees, indicating a systemic failure on the part of the City to address the training inadequacy. *See Connick*, 563 U.S. at 62 (emphasis added). "Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Davis*, 406 F.3d at 384 (citing *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998)). Simply put, Plaintiff has not plausibly alleged that, based on Sgt. Rudloff's purported record of constitutional violations, the alleged constitutional violations in this case were an obvious consequence of the failure to train the DPD generally in managing protests and interacting with the media.

Plaintiff also attempts to plead deliberate indifference of a failure to train through the single-incident exception. Plaintiff asserts that the purported constitutional violations he endured were a highly predictable consequence of the City's failure to train its officers in protest management. *See* Doc. No. 18 at 23-25. According to Plaintiff, because "protests and civil unrest are known to the City to be a recurring facet of life in Dallas," the frequency with which law enforcement needs to respond to such events makes it obvious to a "moral certainty" that officers require training on the constitutional boundaries that govern policing a protest. *Id.* at 24

(quoting *City of Canton*, 489 U.S. at 390 n.10) (internal quotation marks omitted). As Defendant correctly points out, however, the Compliant does not contain any additional allegations regarding the recurrence of protests or civil unrest in Dallas. Doc. No. 22 at 11. Nor does it contain any allegations of other officers engaging in the unlawful arrest of journalists who were exercising their First Amendment rights during the protest in question. The absence of such allegations indicates that the deficient training on protest management and the First Amendment was not so obviously likely to result in the constitutional violations alleged here. *See Conner v. Travis Cnty.*, 209 F.3d 794, 797 (5th Cir. 2000).

Regardless, the single-incident exception is typically reserved for cases where an employee received no training at all. *See Peña*, 879 F.3d at 624. This is not one of those cases, as Plaintiff does not allege that there was "no training whatsoever." *Id.*; *see Hutcheson v. Dallas Cnty.*, 994 F.3d 477, 483 (5th Cir. 2021) ("[T]he plaintiffs cannot avail themselves of that exception because they do not allege that there was 'no training whatsoever.'" (quoting *Peña*, 879 F.3d at 624)). The Court therefore declines to apply the single-incident exception to Plaintiff's failure to train theory.

The Court concludes that Plaintiff fails to plausibly plead that the City was deliberately indifferent in failing to train its officers in protest management and interactions with the media. Accordingly, the Court **GRANTS** Defendant's Motion as to Plaintiff's failure to train claim and **DISMISSES** it without prejudice to repleading.

16

### B. *Failure to Supervise / Discipline Sgt. Rudloff*

Plaintiff does not appear to allege that the City has a standard or consistent policy of shielding officers of the DPD as a collective (*i.e.*, a "systematic inattention" to complaints about officer misconduct in general). *Piotrowski*, 237 F.3d at 582; *see Vess v. City of Dallas* (*Vess II*), 608 F. Supp. 3d 434, 451-54 (Fitzwater, J.) (collecting cases). Instead, Plaintiff's failure to supervise or discipline theory pertains solely to Sgt. Rudloff. *See* Doc. No. 1 ¶¶ 13, 72-74, 113-114; Doc. No. 18 at 28-29; *see also Hayward v. City of New Orleans*, No. CIV.A. 02-3532, 2004 WL 258116, at *5-6 (E.D. La. Feb. 12, 2004). Specifically, Plaintiff alleges that the City has a policy of insufficiently supervising and / or disciplining Sgt. Rudloff, an officer with a history of violating constitutional rights, and that the City was aware or should have been aware of this fact. *See* Doc. No. 1 ¶¶ 13, 72-74, 113-114; Doc. No. 18 at 28-29. Plaintiff argues that the City's failure to properly supervise and discipline Sgt. Rudloff constitutes deliberate indifference towards the constitutional rights of others, and that the policy directly caused Plaintiff's injury, which was a highly predictable outcome given Sgt. Rudloff's purported history. *Id.*

Viewing the allegations in light most favorable to Plaintiff, the Court believes that he has plausibly stated a failure to supervise / discipline claim under § 1983 against the City. The Court offers no opinion as to how this theory will fare at summary judgment, though it believes that these arguments are better suited for resolution at

17

that stage. Thus, the Court **DENIES** Defendant's Motion as to Plaintiff's failure to supervise / discipline claim.

## IV.  Leave to Amend

When a party cannot amend a pleading as a matter of course, the party may amend only "with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). A formal motion under Rule 15(a) need not always be filed, but the party must "give the court some notice of the nature of his or her proposed amendments" and support the request for leave to amend with "*some* specificity." *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016). Rule 15 provides that leave should be freely given "when justice so requires."

The Court is "entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . and futility of amendment.'" *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (quoting *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005)). Plaintiff has not yet amended his Complaint. Further, there is no evidence of undue delay, bad faith, or dilatory motive. Thus, the Court **GRANTS** Plaintiff leave to file an amended complaint within thirty (30) days of this Memorandum Opinion and Order.

## V.     Conclusion

For the reasons discussed above, the Court **GRANTS in part and DENIES in part** Defendant's Motion to Dismiss. Doc. No. 15. The Court **GRANTS** Plaintiff leave to file an amended complaint within thirty (30) days of this Memorandum Opinion and Order. Should Plaintiff fail to timely amend, Plaintiff's failure to train claim against the City will be dismissed with prejudice and without further notice.

**SO ORDERED.**

Signed March 30th, 2023.

_____
ED KINKEADE
UNITED STATES DISTRICT JUDGE